Samuel Evans Maires's Disbarment.    Appeal of Samuel
Evans Maires.

*Attorneys at law — Unprofessional conduct—Fraud—Champerty—Barratry—Deceiving client—Illegal agreement.*

In a proceeding to disbar an attorney, the evidence showed that the respondent employed boys, students and others in his office to visit people for the purpose of suggesting litigation and securing his employment ; that he kept printed forms in his office and induced suitors to sign them making himself a part owner of their claims, and reserving to them only a half interest, after deduction of all expenses ; that when recoveries were had, he systematically and falsely reported the sums received by him as less than the amount actually received; that he further fraudulently reduced the amount coming to his clients by deducting therefrom under pretense of exorbitant payments to boys and students in his office sums often equalling the balance handed to his clients; and that he procured his clients' signatures to papers in which blanks were left which he fraudulently filled so as to cover up and conceal his misrepresentations as to the amounts received by him. *Held*, that the court committed no error in disbarring the respondent.

Argued Oct. 28, 1898.    Appeal, No. 209, Jan. T., 1898, by Samuel Evans Maires, from order of C. P. No. 4, Phila. Co., Dec. T., 1897, No. 1359, disbarring attorney at law.    Before McCollum, Mitchell, Dean and Fell, JJ.    Affirmed.

Rule to show cause why an attorney at law should not be disbarred.

The facts appear by the opinion of Arnold, P. J., which was as follows :

Proceedings to disbar attorneys are among the most delicate and disagreeable, as well as infrequent, duties that pertain to a court of justice.    As the result of disbarment is to deprive the attorney of his means of livelihood in the profession to which he has given years of study and preparation, it is of the greatest importance that care and deliberate action should be taken in order that no wrong may be done to the accused.    "On one hand," said Chief Justice Marshall, "the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise.    The right

to exercise it ought not to be lightly or capriciously taken from him. On the other, it is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved: ". Ex parte Burr, 9 Wheaton, 529. The interest of the people at large should be conserved by the court, in order that those who must of necessity place their property, their liberty, and even their lives in the care of an attorney, should be secure in their confidence in the integrity of their advocate. They should be assured that, whatever misfortune may happen to them, they will not be despoiled by the one in whom they have placed their trust. The oath which an attorney takes on his admission to practice, while short, is very comprehensive. He declares that he will behave himself in the office of attorney according to the best of his learning and ability, and with all good fidelity, as well to the court as to the client; that he will use no falsehood or delay any person's cause for lucre or malice. This oath should inspire rectitude of conduct in the person who takes it, and confidence on the part of the people which is as sacred as that which exists between confessor and penitent. The law encourages the utmost freedom of communication between the lawyer and the client, by declaring not only that the lawyer cannot be compelled to divulge the information he receives as attorney, but also that he shall not be permitted to do so. Knowledge of this fact begets the confidence between attorney and client which is essential to the relation between them. It disarms suspicion and prevents watchfulness on the part of the client. Hence the necessity and duty of the court to do all that is possible in preserving the integrity of the members of the bar, so that the popular confidence in lawyers may not be abused and dissipated. "The profession of the law," said Lord BOLINGBROKE, "in its nature the noblest and most beneficial to mankind, is, in its abuse and abasement, the most sordid and pernicious." If, instead of keeping up the tone of his profession, the lawyer debases it by the practice of methods in vogue between persons who deal adversely with each other, we will have, as Chief Justice SHARSWOOD said in his valuable book on Legal Ethics, "a horde of pettifogging, barratrous, custom-seeking, and money-making lawyers, which is one of the greatest curses with which any state or community can be visited." If falsehood is used,

the consequence upon professional character is to turn lawyers into higglers with their clients, and then, when the truth is discovered, we have suits by clients against their attorneys, and proceedings for disbarment, with the resulting strain upon the confidence of the people in the profession at large. By admitting an attorney, the court presents him to the public as worthy of its confidence, and it is the duty of the court, after full and satisfactory proof of his delinquency, to withdraw its indorsement: Davies's Case, 93 Pa. 116.

The present proceeding is directed against a member of the bar who has so often appeared in the trial of causes that he cannot plead want of experience as his defense to the charge now made against him. Indeed, he made no defense of that kind, but, on the contrary, attempted to justify his conduct by asserting a legal right to do as he did in the series of cases to which we will hereafter refer. The case which gave rise to the inquiry which resulted in the application for the present rule was that of Hesta V. Cook v. The People's Traction Company and the Philadelphia Traction Company in this court, of June term, 1895, No. 460. The action was commenced on June 10, 1895. One year afterwards the death of Hesta V. Cook was suggested, and Richard B. Sheridan, administrator of her estate, was substituted as plaintiff. On January 13, 1897, a verdict was rendered for the plaintiff against the Philadelphia Traction Company alone for $8,000. A motion was made for a new trial, which was granted on March 18, 1897. In the mean time a dispute had arisen between Mr. Sheridan, the administrator, and Mr. Maires, which resulted in the resignation and discharge of Mr. Sheridan by the orphans' court and the appointment of John D. Yarrow, Esq., as administrator d. b. n. in his stead. On March 3, 1897, Mr. Yarrow was substituted as plaintiff. On the death of Hesta V. Cook, her estate vested in her mother, Mary B. Henning. Some dissatisfaction with Mr. Yarrow arose, whereupon Mrs. Henning retained Francis Shunk Brown, Esq., as her counsel, and applied to the orphans' court for the removal of Mr. Yarrow, and in that proceeding the following agreement was made public:

"I, Mary B. Henning, mother and only heir at law of Hesta V. Cook, deceased, do hereby agree that Samuel Evans Maires, Esq.,

my attorney, shall collect through John D. Yarrow, Esq., administrator of the estate of Hesta V. Cook, deceased, all moneys that he can legally collect from the Philadelphia Traction Company in the case of Cook, by her administrator, &c., vs. the said company, common pleas, No. 4, June term, 1895, No. 460, in which case a verdict has been obtained in favor of plaintiff for $8,000, interest and costs, and said Samuel Evans Maires shall retain for his fees, administrator's fees, costs and expenses, physicians', bills, and other expenses, all moneys over and above the sum of $1,000, which sum shall be paid me in full and final settlement of all my claims against the estate of Hesta V. Cook, deceased, and which sum of $1,000 I hereby agree to accept as a full and final payment to me for all claims and demands against said Philadelphia Traction Company because of said verdict of $8,000, and in full for all claims against the said estate of Hesta V. Cook, deceased.

" Witness my hand and seal this tenth day of February, A. D. 1897.

"MARY B. HENNING.   [Seal]

" Witnesses at signing :

" J. F. FULLAWAY,

" J. C. WHEDON.

" We agree to the above.    2-10-'97.

"SAMUEL EVANS MAIRES,

" Attorney, &c.

"JOHN D. YARROW,

" Administrator d. b. n."

This agreement was so novel and amazing that the agent of the traction company concluded to go over some of the other cases which Mr. Maires had conducted against the company, when the cases on which the present rule is based were discovered and brought to the attention of this court by the committee of censors of the Law Association of Philadelphia. At the hearing of the rule, Mr. Maires testified that he was to receive one half of the balance remaining out of any verdict, after deducting expenses and costs, and, when called upon to explain by what process the amount to be paid to the plaintiff was reduced to $1,000, he testified that the expenses of the suit were so large as to justify him in retaining all above $1,000. He

said that he paid out for expenses, incidental details, and money, about $1,000; that he had paid a detective upwards of $400 or $450; that he had a great many doctors' and other bills to pay, aggregating $1,300 or $1,400. He produced a paper called an expense account, beginning December 25, 1895, and coming down to February 8, 1897. In this account are four items for detectives, amounting to $315.50. There are six items, entitled "subpœnas, car fares, and incidental expenses preparing for trial," amounting to $103.50, and for doctors, $900. The sum of $250 was charged for the services of an assistant in his office for making a brief and points for charge. What his fee of one half the amount to be recovered was to be paid for, unless it was to cover such a charge, is a question which naturally suggests itself and admits of only one answer. The necessity for the actual employment of, and payments to, detectives, were not shown, and as for the doctors, nothing whatever had been paid, but simply "agreed to be paid." This expense account is dated February 8, 1897, and is signed by J. W. Henning (the stepfather) and M. B. Henning (the mother of Hesta V. Cook), by whom it was agreed that the amount thereof, $1,877, "shall be deducted from any moneys recovered, and the balance of any money left after payment of said $1,877 shall be equally divided between Mary B. Henning and Samuel Evans Maires, share and share alike." This was followed by the agreement of February 10, 1897, before referred to, by which Mrs. Henning was to receive $1,000 out of the $8,000. The facility and frequency of and discrepancy between the agreements made between Mr. Maires and his client certainly arrest attention. As to the various items of this expense account, we are compelled to say that most of them are fabulous and mythical. They could not be allowed under any circumstances.

This last agreement was illegal and void. An agreement made by a client with his counsel, after the latter had been employed in a particular business, by which the original contract is varied so that a greater compensation is secured to the counsel than was agreed upon when he was first retained, is without consideration and cannot be enforced: Lecatt v. Sallee, 3 Porter's (Alabama) Reports, 115. Maires's contract ceased to be one for a contingent fee, and was in effect the purchase of a lawsuit. "The purchase of a lawsuit," said Chancellor KENT,

" by an attorney, is champerty in its most odious form, and it ought equally to be condemned on principles of public policy. It would lead to fraud, oppression, and corruption. As a sworn minister of the courts of justice, the attorney ought not to be permitted to avail himself of the knowledge he acquires in his professional character to speculate in lawsuits. The precedent would tend to corrupt the profession and produce lasting mischief to the community: " Arden v. Patterson, 5 Johns. Ch. Rep. 44.

At the hearing of the present rule the first case examined was that of Robert J. Proctor. Proctor was the driver of a wagon and met with an accident by collision with a car of the Philadelphia Traction Company. A young man called upon him and asked him if he would give the case into his hands. After two or three calls Proctor agreed to do so upon an agreement that the attorney, Mr. Maires, was to have one half of the amount recovered. Some time afterwards Maires told Proctor that he had got $150 from the traction company, which was $50.00 more than he expected. He paid Proctor $75.00, handing him certain papers to be signed. The fact is that Maires collected $400 on the claim. We make a reference to the written agreements in this case as a sample of the agreements made in the series of cases. On September 11, 1891, it was agreed, on a printed form, that Maires should be appointed Proctor's " true and lawful attorney, irrevocable at law and in fact, to make all negotiations with and bring all suits or actions at law or in equity against the Philadelphia Traction Company, and to perform whatever professional service is necessary for the recovery of damages." It was also agreed that Maires was " to make all negotiations, bring, conduct, and prosecute all suits, perform whatever professional service was necessary, and expend all money deemed requisite by him for the recovery from the said Philadelphia Traction Company of the said damages for the injury sustained by the said Robert J. Proctor." In consideration thereof, the said .Proctor agreed " that he will give his time and attention to the recovery of said damages, and for that purpose will appear in court or elsewhere and testify, will make every effort to procure other witnesses, and will assist in every way in his power whenever requested so to do by the said Maires." It was further agreed that if any moneys

are recovered, the said Maires "shall deduct and retain out of the same a sum sufficient to reimburse him for all moneys paid out as costs and expenses incident to said recovery, and shall retain one half part of the balance then remaining as a fee for his professional services rendered in the recovery of said money." The same day Proctor constituted Maires his attorney irrevocable to institute and pursue into final judgment, decree, and execution, any process or suit which he should deem expedient, and, at his discretion, to compromise or settle any negotiations or suit, and to satisfy of record any judgment or decree for such sum as he shall deem proper, and to collect and receive all moneys due from the Philadelphia Traction Company arising from said negotiation, suit, judgment, or decree, and to execute and deliver all releases, receipts, and acquittances therefor. On November 12, 1891, in consideration of $75.00, Proctor executed a general release to Maires on account of his collection from the Philadelphia Traction Company as damages for injuries sustained by him. On November 9, 1891, Proctor executed a general release to the traction company for the damages for his injuries. This release contains a receipt for $400.

Mr. Proctor testified that the sum of $400 was not in the release when he signed it ; that there was nothing on the paper but printed matter. This was denied by Mr. Maires, but, in view of the subsequent developments before us, we are compelled to give credence to Proctor and not to Maires upon this point. Mr. Maires states that the expenses in this suit reduced the amount to be divided to such an extent as to leave only $75.00 for the plaintiff. It appeared that Proctor wanted to settle the case, but Maires objected. In this case, as in others, Mr. Maires seemed to act upon the theory that he was the party injured, and that the plaintiff was a mere beneficiary who should count all he received as so much clear gain. He says he told Proctor that, inasmuch as he had been guilty of a breach of the original contract by insisting upon a settlement of the case contrary to his (Maires's) desire, he wanted $200. The sum of $45.10 was charged for costs and expenses. Then there was deducted the sum of $79.50, which Mr. Maires said he paid to Mr. Eastwick, who was at that time a student or office boy, for going about collecting the evidence and assisting Mr. Maires in his work, which he called detective work. It was by charges

such as these and by disputes with his client that Mr. Maires frittered down the allowance to Mr. Proctor to $75.00. He says he took his half first, $200, then deducted the costs and expenses, $125, and gave the remainder, $75.00, to the client. This was neither according to the contract nor honest.

The next case was that of Charles Kriebel. Kriebel had a child who was run over and killed by a trolley car about ten o'clock in the morning. The same evening, about eight or nine o'clock, a young man came to him and gave him Mr. Maires's card, and said that if Kriebel intended to sue the company he would like him to see Mr. Maires. The result was the engagement of Maires by Kriebel, and agreements similar to those before referred to were made, in writing and printing. An action was brought, and after awhile the case was settled, Mr. Maires paying Kriebel $125. It turned out, however, that Maires received $500. Mr. Kriebel said that Maires told him he had settled the case for $250. A release was executed to the traction company. Mr. Kriebel says the sum of $500 was not on it when he signed it; or, if it was on, the paper was turned under so that he could not see it, for he never knowingly receipted for $500, and never knew that $500 was received in settlement of his case. Mr. Maires says the amount of expenses in this case was $81.50, and that he thought $125 ought to be satisfactory to Kriebel, since he had to pay the young man who had "investigated" the case $93.50. Mr. Maires complained that Mr. Kriebel insisted on settling the case, whereas he wanted to try it. He claimed the right to try the case, and that it should not be settled without his consent.

The next case was that of Frederick Goetz. Goetz had been injured in a collision. He was taken to the Pennsylvania Hospital, and even there one of the ubiquitous "young men" presented Mr. Maires's card and solicited employment in the case. Maires was employed and the same series of papers was executed. After awhile Maires sent for Goetz and told him he had received $100 and gave Goetz $50.00. In fact, Maires had collected $200. This case was "investigated" by Maires's assistant; the costs were figured up to about $100, and then Mr. Goetz was paid $50.00 out of the $200. A curious part of this settlement is that the traction company paid the sum of $125 for the damages as such, and $75.00 for the costs and expenses, making a total of $200.

The next case was that of Daniel Cummings, who had met with an accident. A couple of days afterward a young man called on him and recommended Mr. Maires, who was employed by Cummings, and the usual written agreements were signed. Some time afterwards Mr. Maires sent for Mr. Cummings and told him that he had collected $20.00 for him, which was all the company was willing to give. In fact, the company had paid $100 in settlement of this claim. The receipt which Mr. Cummings gave for this money states that the $20.00, with the money retained for fee, expenses of witnesses and costs, is in full for all moneys collected from the Philadelphia Traction Company for the injuries sustained by Cummings. No action was brought in this case or in the Goetz case. Mr. Maires said this case was investigated by Mr. Fullaway and Mr. Eastwick, who worked on the case, and it turned out that the man was not very seriously hurt. He said he took $20.00 for his fee, gave Cummings $20.00, paid Mr. Fullaway and Mr. Eastwick each $20.00, and the other $20.00 went for witnesses and incidental expenses, when there was no suit brought and consequently no witnesses to be paid.

The other cases were those of Mary E. Vallette and her sister, Eliza Nixon, and Louis Gerstenacker. In these cases the agreements were the same as in the others. Maires collected for Mary Vallett $250 and paid her $100. In Eliza Nixon's case he collected $100 and gave her $25.00. In Gerstenacker's case he received from the traction company $200 for damages and $50.00 for costs. He paid Gerstenacker $75.00. In these as in all the cases, Maires deceived and defrauded his clients.

Mr. Maires's construction of the agreements in all these cases is best given in his own cross-examination. He said that under the irrevocable power of attorney he had an equitable assignment of the claim, of so much of the fund as might be obtained; that he had an interest, which, under the power of attorney and agreement, gave him the right to say whether the case should be settled or not; and that when his client wanted to make a settlement he considered it a breach of the agreement with him; in fact, that he was a part owner, and had a right to control the disposition of the case. This strange contention seems hardly deserving of an answer; but a similar case arose in Chicago, and the Supreme Court of Illinois decided that a defendant sued for

damages for negligence may settle with and pay the plaintiff without notice or payment to the attorney, who had an agreement that he was to have one half the damages for his services, and that notwithstanding the defendant knew of the existence of the agreement: North Chicago Street Ry. v. Ackley, 171 Ill. 100, decided December 22, 1897.

If these carefully drawn agreements astonish us, Mr. Maires's statements on the stand astonish us more. They make us wonder how any one with any sense of professional propriety or regard for legal ethics could conceive and deliberately make and preserve such agreements. They contain every ingredient necessary to make a case of champerty at common law, and furnish written proof thereof which is indisputable. " Champerty," says Blackstone in the fourth volume of his Commentaries, page 135, " is a bargain with a plaintiff or defendant to divide the land or other matter sued for between them if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense. . . . These pests of civil society that are perpetually endeavoring to disturb the repose of their neighbors and officiously interfering in other men's quarrels, even at the hazard of their own fortune, were severely animadverted on by the Roman law . . . . and they were punished by the forfeiture of the third part of their goods and perpetual infamy." It is the agreement to carry on the suit at the expense of the attorney for a share of the profits that constitutes champerty. No question as to the validity of an agreement for a contingent fee arises in this matter. There was no complaint that Mr. Maires contracted for a contingent fee. The complaint was that he defrauded his clients of their full share. Besides contracting for the control of the suits, he bound his clients to give their time and attention to the recovery of damages, to appear and testify in court, procure witnesses and assist him, as if he were the principal and the client was a mere agent.

The manner of obtaining the right to bring these suits involves another common-law offense, that of common barratry. Persons who did not care to bring suit, and perhaps thought their injuries were as much the result of their own carelessness as that of any one else, or were unwilling to invest their money in the moderate costs of a lawsuit, were hunted up by the assistants or students, office boys, or " runners " of Maires, as these

pests are called, and thus litigation was made and dishonesty ensued in the division of the spoils. " Common barratry," says Mr. Justice BLACKSTONE, " is the offense of frequently exciting and stirring up suits and quarrels between his Majesty's subjects, either at law or otherwise. The punishment for this offense in a common person is by fine and imprisonment; but if the offender (as is too frequently the case) belongs to the profession of the law, a barrator, who is thus able and willing to do mischief, ought also to be disabled from practicing for the future : " Fourth Commentaries, 134.

If we take Mr. Maires's construction of his agreements to be correct, and that he had an interest in the various claims intrusted to him, then he was a partner with the plaintiffs, and in his subsequent dealings with them has been guilty of the modern statutory offense of fraudulently converting partnership money to his own use. Either way we look upon his dealing, as a champertor, barrator, or dishonest partner, we find no mitigation whatever, no excuse for his conduct.

The cases brought to our attention have given positive proof of that which is frequently heard in ordinary conversation, that there are lawyers who make it a business to hunt up litigation, take cases upon speculation, and pay the costs, with the usual result—quarrels with their clients based upon a dishonest and unfair division of the moneys recovered. No lawyer with a proper sense of the dignity of the profession, as well as his own self-respect as a man, will stoop to such practices as have been laid bare in the present proceeding. Not even death can keep these ghouls of society at bay; their emissaries invade the house of mourning; they enter the hospital; no place is sacred from their intrusion. If any more such exist, it is hoped that the censors of the Law Association will continue their laudable efforts, until the offenders shall have been discovered and driven out of the profession.

The assistant or runner who hunts up these cases is a nuisance which should be abated. He participates in the spoils, his share being covered up in the items for investigating, working up cases, and doing detective work. Perhaps these runners manufacture testimony, for in at least one of the cases exposed before us, the charge for witness fees is greater than the amount paid to the only witnesses known to the plaintiff. From the

number of cases of this kind in which Mr. Maires appears, we are led to believe that much of his business was obtained in this improper way.

Lawyers who employ runners, pay them for hunting up cases, take cases on an agreement to advance the costs, and cheat their clients in the division of the amount recovered, violate their oath. They do not behave with all good fidelity to the court as well as the client, and they use falsehood. Such lawyers, when discovered, will be disabled from practicing in the future.

Some criticism was made upon the action of the Philadelphia Traction Company, Mr. Brown, the counsel for Mrs. Henning, and the censors of the Law Association. In reply thereto it should be said, as it is due to them to say, that their action in this matter has been highly commendable, although exceedingly disagreeable and wearisome. The censors of the Law Association occupied many months in the preliminary inquiry before applying for the present rule. They gave Mr. Maires notice of their meetings, so that he was present by himself and counsel, and knew everything which was being testified. He was not taken unawares nor by surprise; nor was anything alleged against him here in court of which he did not have previous and full notice, so that he could be prepared to meet the charges.

Upon the facts as developed before us, we are constrained to say that Mr. Maires is unfit to be continued longer as a member of the bar of this court, and that an order will be made striking his name from the roll thereof. A certified copy of this order will be sent to the courts of common pleas, the orphans' court, and the court of oyer and terminer and quarter sessions of this county.

*Error assigned* among others was the order of the court disbarring the respondent.

*David W. Sellers*, for appellant.—The court below erred in adjudicating that the printed contract constituted in the making thereof an act of professional misconduct on the part of the appellant: County of Chester v. Barber, 97 Pa. 462; McFarland's Est., 4 Pa. 149; Strohecker v. Hoffman, 19 Pa. 223; Perry v. Dicken, 105 Pa. 83; Mumma's App., 127 Pa. 474; In re Paschal, 10 Wallace, 483; Sloo v. Law, 4 Blatchford (U. S.), 268; Hunt v. Rousmanier, 8 Wheaton, 174.

The evidence is overwhelming in each case that appellan⁺ fully informed his client of the sum received by him from the Philadelphia Traction Company, and that each settlement was made upon full knowledge. It would have been the duty of a trial judge, upon the writings and the parol testimony, to have instructed the jury to find for the appellant, if he had been sued at law: Rowand v. Finney, 96 Pa. 196.

As it is conceded that appellant in no instance retained any money belonging to his client after any demand of him, the court below erred in striking his name from the roll of attorneys, and such action is in conflict with section 73 of "An act relative to the organization of the courts of justice:" Krause v. Dorrance, 10 Pa. 462.

The order of May 14, 1898, was, relatively to the proceeding in which it was the final order, the infliction of a cruel punishment, and contrary to the spirit of section 13 of article 1 of the declaration of rights in the constitution of this state: Ex parte Garland, 4 Wallace (U. S.), 333.

*Richard P. White*, with him *Joseph C. Fraley*, and *George Wharton Pepper*, for appellee, cited Gregerson v. Imlay, 4 Blatchford, 504; Filon's Est., 21 Pa. C. C. R. 109; Wood v. Downes, 18 Vesey, Jr., 120; King v. Warden, 12 Mod. 337; Austin's Case, 5 Rawle, 191; Hirst's Case, 9 Phila. 215; In re Boone, 83 Fed. Rep. 957; United States v. Costen, 38 Fed. Rep. 24.

PER CURIAM, January 2, 1899:

This is a case of disbarment. The preliminary proceedings in it originated in the complaints made to the committee of censors of the Law Association of Philadelphia by the clients of Samuel Evans Maires, the party complained of. Nine separate complaints in writing, and each of them supported by an affidavit, were laid before the committee who notified Maires of the complaints and furnished him with copies of the same, accompanied by a request that he answer them if he desired to do so. An answer was subsequently filed by Maires in which he set up a sealed contract with each of the complainants, and denied that he had deceived or defrauded either of them in any of the transactions to which their contracts with him related.

After the filing of the answer the committee held divers meetings for the purpose of hearing the oral statements of the complainants and Maires and of such witnesses as the latter saw fit to call. The committee after hearing these statements held two meetings for the purpose of consultation and deliberation upon the testimony and arguments of counsel, the result of which was a unanimous conclusion that the complainants had made out a clear case of unprofessional conduct which was not satisfactorily answered by Maires, and was therefore a proper case for presentation to the court for action. This conclusion was followed by the appointment of a subcommittee of three to take the matter in charge and bring the several questions involved before the court for determination. The hearing was had before Judges ARNOLD, WILSON and AUDENRIED, in common pleas No. 4, where the testimony of the complainants and Maires in relation to the matters under investigation was taken, together with the testimony of other persons called by them to testify on the same subject. The testimony thus taken, together with the written complaints made to the committee of censors, and the contracts between Maires and the complainants, were for the consideration of the judges in determining whether the complaints were sustained by the evidence and, if so, whether the transactions complained of constituted sufficient ground for the suspension or disbarment of Maires. The judges upon a careful consideration of the testimony were convinced that the complaints were well founded, and that the transactions to which they related disclosed such gross professional misconduct as called for disbarment. That the testimony fully warranted this conclusion cannot be seriously questioned. As the transactions were detailed in the opinion of Judge ARNOLD it is unnecessary to specify or describe them herein. It is sufficient to say of them that they fully authorized the decision complained of on this appeal.

Judgment affirmed.