## In re Bowman.

*Harvey E. Knupp, Scott S. Leiby* and *David M. Wallace,* for rule.
*Carl B. Shelley* and *Maurice R. Metzger,* contra.

HARGEST, P. J., October 20, 1930.—A committee of the Dauphin County Bar Association presented a petition, upon which a rule was granted against Irvin P. Bowman, a member of the Bar of Dauphin County, to show cause why he should not be disbarred. An answer was filed and testimony taken. Upon submitting the case to the court eleven requests for findings of fact were submitted by the petitioners and twenty-five by the respondent, all of which have been answered. We will restate here only such facts as are necessary to an understanding of our conclusions.

### Findings of fact.

1. In March, 1923, Edward S. Sunday and his wife executed to Bowman, as trustee, a second mortgage on the property purchased by them in the sum of $900, securing two bonds for $400 and $500 respectively. Bowman assigned the $400 bond to C. W. Groff, and the $500 bond to Lizzie E. Albert. Subsequently the Sundays paid the full amount of the principal and interest to Bowman, and on December 8, 1928, Bowman satisfied the mortgage in full.

The mortgage and bonds were demanded from him and he said that he did not have the mortgage—had apparently destroyed it—and did not know who the holder of the $400 bond was. He has not paid any part of the proceeds of these bonds to the holders thereof, and excused his failure to pay them on the ground that he advanced the interest to the bondholders prior to having received the principal.

2. Albert W. Reed purchased a property through Bowman and asked him to examine the title. The purchase was made subject to a $3000 mortgage, executed by one Louis J. Lickel to Bowman, as trustee, securing two bonds in the sum of $1500 each. Bowman sold one bond to J. W. Wanbaugh and the other bond to Isaac M. Fetterhoff. On June 3, 1926, December 6, 1926, and January 4, 1927, Reed paid $200 on account of the principal, making a total of $600. No part of the $600 was paid to either Wanbaugh or Fetterhoff but was appropriated to Bowman's own use.

3. In January, 1924, Bowman invested for Florence B. Hohenshilt (now Cornelius) $4000 in a mortgage on the property No. 913 South Seventeenth Street. On December 19, 1927, at the request of the respondent, and upon his representation that the mortgage was to be paid and satisfied, Miss Hohenshilt, expecting to receive the cash, satisfied the mortgage of record. Instead of paying her, Bowman informed her that he did not have the money received by him for the satisfaction of the mortgage, but in its place gave her a mortgage and bond to the amount of $4000, which he represented as a first lien upon a brick house at No. 215 South Twentieth Street. It was, in fact, a fourth lien. There was no house built on the property. Bowman had invested only $1750 of her $4000, and although he promised to send her a fire insurance policy within a few days, failed to do so. The mortgagor of the property No. 215 South Twentieth Street went into bankruptcy. Bowman paid Miss Sohenshilt $100 on January 9, 1929, $150 on February 20, 1929, and she received from the bankrupt's estate $240. Bowman then, instead of paying her the cash which he had previously appropriated to his own use, gave her two additional mortgage bonds of $1000 each, marked "collateral," which were a part of a series of bonds secured by a $13,000 mortgage on unseated land in the City of Harrisburg. Mrs. Cornelius has never received any further payments, although she repeatedly demanded cash.

4. On July 19, 1920, Peter Vanderloo, Jr., executed a mortgage to Emma J. Moyer in the sum of $1000 which secured two bonds, one in the sum of $700 and the other in the sum of $300. Emma J. Moyer, on July 19, 1920, assigned the $300 bond to Catherine L. Hummel and through subsequent assignments it became the property of John F. Bower, the present owner, April 8, 1926. Bower purchased the bond from Bowman on that date and paid him $300 for it. Bowman periodically paid the interest to Bower, the last payment being made June 8, 1929, for the period ending April 11, 1929, notwithstanding the fact that Emma J. Moyer, through her attorney in fact, and with the knowledge of Bowman, satisfied the mortgage on May 27, 1926. Bower was never advised of the satisfaction and never has received anything on account of the $300 principal which he paid to Bowman.

5. On June 8, 1929, Bowman, as attorney for Elizabeth S. Bowman, assigned to John F. Bower a bond given by Abraham Gerber to Elizabeth S. Bowman, dated May 28, 1920, in the sum of $1000, which amount Bower paid to Bowman. Bowman continued to pay the interest semi-annually to Bower, the last payment being made June 18, 1929, for the period ending June 8, 1929, notwithstanding Elizabeth S. Bowman had satisfied the mortgage on July 3, 1920. Bowman never disclosed to Bower the fact that the mortgage

securing his bond had been satisfied, although he had personal knowledge of that fact.

6. On November 14, 1918, Henry J. Quier gave to William J. Sohland a mortgage in the sum of $3000. On March 16, 1919, Sohland, through Bowman, his attorney, assigned a bond in the sum of $1000 secured by this mortgage to John F. Bower, and Bower paid Bowman $1000 therefor. Since said assignment Bowman has regularly paid to Bower the semi-annual interest, the last payment being made on November 12, 1929, which paid the interest to September 6, 1929, notwithstanding Sohland had satisfied the mortgage on June 19, 1919. This mortgage was satisfied at the request of Bowman, who continued to pay to Bower the interest for more than ten years without advising Bower, who had no knowledge of the fact.

7. On March 15, 1925, Stanley G. Backenstoss executed a mortgage to Emeretta Gorkes in the sum of $2000, securing a bond in the sum of $1200 and a bond in the sum of $800. The $1200 bond was delivered to Emeretta Gorkes. On June 5, 1926, at the instance of Bowman, Emeretta Gorkes assigned the $800 bond to the Isaac Hepler estate. Since that date Bowman has regularly paid the interest semi-annually to the Isaac Hepler estate, notwithstanding the mortgage was satisfied by Emeretta Gorkes at the request of Bowman, who received the full principal sum of $2000 on December 12, 1927. He never paid the Isaac Hepler estate any part of the principal sum or advised the estate of the satisfaction of the mortgage.

8. On August 20, 1923, as attorney for Emma C. Groff, he caused a bond to be assigned to Emma C. Groff by Mary L. Mehring, in the amount of $600, and on March 18, 1924, as attorney in fact for Emma C. Groff, he assigned the same bond to Pauline Nauss, to whom he occupied a confidential relation as financial adviser and attorney. The mortgage securing this bond and other bonds of the same series was satisfied October 6, 1922, and Bowman either knew or ought to have known of that satisfaction. He recommended the investment to Pauline Nauss as a safe one, notwithstanding the satisfaction a year and five months before.

9. On October 8, 1927, Calvin A. Eckert delivered a mortgage with accompanying bonds to Bowman covering four properties on Holly Street in the City of Harrisburg. On March 24, 1928, he assigned to Jennie Reitzel one of these bonds for the sum of $1500 cash. On September 24, 1928, Bowman entered his own satisfaction in full of said mortgage, receiving payment therefor, and has paid nothing on account of the principal of said bond to Mrs. Reitzel.

In many of the transactions, if not in all, Bowman acted as the confidential financial adviser for the people whose money he invested, and he was regarded by some of them as their attorney, although he undertook no other matters of law in their behalf. His explanation is that his operations were so numerous and varied that when he exchanged new bonds for old ones or advanced interest out of his own funds before the interest was paid to him he could not or did not keep accurate track of the payments, and, therefore, overlooked his responsibility with reference to the payments of principal at the time the various mortgages involved in these transactions were satisfied, and that he had paid out a large amount of his own money in excess of·the amount which he had from time to time received. The fact, nevertheless, remains that he did not pay to the persons involved in the complaints before us money to which they were entitled, notwithstanding the demands therefor. This evidence makes out some clear cases of misappropriation of funds and violation of the criminal laws, against which the statute of limitations had

run before the hearing, and before the matters were brought to the attention of the court: Com. *v.* Bretz, 22 Dauph. Co. Rep. 29. However, no indictments were brought. In addition to the misappropriation of money, Bowman has been proven untruthful and unreliable to those who implicity trusted him and unworthy to hold the high office of an attorney at law.

### *Discussion.*

Section sixty-eight of the Act of April 14, 1834, P. L. 333, 17 PS § 1602, authorizes the courts "to admit a competent number of persons of an honest disposition, and learned in the law, to practice as attorneys in their respective courts." Every attorney is required by the sixty-ninth section of this act, 17 PS § 1603, to take an oath, in part, as follows: "That you will behave yourself in the office of attorney . . . and with all good fidelity, as well to the court as to the client, that you will use no falsehood, nor delay any person's cause for lucre or malice."

Section seventy-three of the same act, 17 PS § 1661, provides: "If any attorney at law shall misbehave himself in his office of attorney, he shall be liable to suspension, removal from office, or to such other penalties as have hitherto been allowed in such cases by the laws of this commonwealth."

Section seventy-four of the act, 17 PS § 1662, provides: "If any such attorney shall retain money belonging to his client, after demand by the client for the payment thereof, it shall be the duty of the court to cause the name of such attorney to be stricken from the record of attorneys, and to prevent him from prosecuting longer in said court."

The respondent contends that he ought not to be disbarred because the matters complained of have not arisen out of professional relations as attorney, and he has not been indicted or convicted for any alleged misappropriation of funds. Neither of these defenses is sound. The power to disbar an attorney is inherent in the court, aside from the general power given by the Act of 1834: Balogh *v.* Jackson, 272 Pa. 482, 487; Wolfe's Disbarment, 288 Pa. 331. In the latter case Mr. Justice Sadler said at page 334:

"Before admission to the bar the court must be satisfied of the moral fitness of an applicant, and, if it subsequently learns that the attorney is no longer to be trusted, it becomes its duty on proper application, to see that he ceases to be held out as worthy of professional employment: Davies's Case, 93 Pa. 116. The exercise of this power is inherent in the court, and not limited by reason of the legislative provision for summary proceedings, where money of a client has been improperly retained, especially directed by the Act of 1834 (April 14, P. L. 333, section 74); Graffius's Case, 241 Pa. 222; Balogh *v.* Jackson, 272 Pa. 482."

In Gottesfeld's Case, 245 Pa. 314, 317, Mr. Justice Stewart said:

"It was of no consequence that in committing the offense of which he was convicted appellant was exercising no function of his professional office. . . . The disbarment that followed was not punitive, but protective simply. Courts can command public confidence only as those who serve therein are themselves observant of the law which it is the duty of the courts to enforce. In his high office the attorney-at-law is a minister of justice; he ceases to be so when, whether in the line of his professional work or outside of it, he prostitutes his knowledge of the law . . . by deceit and falsehood in its one and only purpose, viz: to accomplish distributive justice among men."

In In Re Graffius, 241 Pa. 222, it is held:

"The power of the court to disbar an attorney should be exercised with great caution but there should be no hesitation in exercising it when it clearly

appears that it is demanded for the protection of the public. The court by admitting an attorney to practice endorses him to the public as worthy of confidence in his professional relations and if he becomes unworthy, it is its duty to withdraw its endorsement."

And this is so even though a rule for disbarment was allowed to rest five years. The statute of limitations has no application to such a case nor does delay amount to laches: Wilhelm's Case, 269 Pa. 416.

In Bretz's Disbarment, 22 Dauph. Co. Rep. 29, 30, 32, the allegations were very much the same as in the instant case. Money of clients invested by Bretz upon a mortgage was subsequently paid to him but not turned over to the client. This court said:

"The suggestion that before the court can act the party complained against must be indicted and convicted, does not apply to a case of the kind before us. The cases in which a proceeding by indictment is necessary, are cases in which the attorneys have been charged with criminal conduct, not in any way connected with their professional or official position. But where, as here, the matter complained of relates directly to the conduct of the respondent as an attorney, no previous proceeding by indictment is necessary. The suggestion made in behalf of respondent that it does not clearly appear that he was acting in his official capacity as an attorney-at-law in the matters alleged in the petition, is not sustained in the evidence. In practically all of them the misconduct complained of appears to have been committed as an attorney-at-law. There is no evidence that he acted in these matters otherwise than an attorney-at-law and his answer admits it. We find from the evidence that demand was duly made upon the respondent for the moneys received by him."

Proceedings to disbar attorneys are both delicate and disagreeable. Fortunately, they are infrequent. Disbarment deprives an attorney of his means of livelihood, to which perhaps he has given years of study and preparation, and such proceeding should be fully justified; and when justified, the court should not hesitate to undertake to enter such judgment. The interests of the people at large are concerned. An attorney holds himself out to undertake relations of trust and confidence with his clients. He swears that he will behave himself well in the office of attorney, "with all fidelity, as well to the court as to the client;" this should inspire both rectitude of conduct in the person who takes the oath and confidence on the part of the people. It is, therefore, the duty of the court, as far as possible, to preserve the integrity of the bar so that popular confidence in lawyers may not be abused. By admitting an attorney the court represents him to the public as worthy of its confidence and it is the duty of the court, after full and satisfactory proof of his delinquency to withdraw its endorsement: Davies's Case, 93 Pa. 116; Maires's Disbarment, 189 Pa. 99; Kennedy's Disbarment, 178 Pa. 232. Applying these principles, it follows as a necessary sequence to the facts which we have found in this case that the order of disbarment must issue. In Dixon v. Minogue, 280 Pa. 128, 131, it is said:

"The order of disbarment flowed from the determination that respondent had retained money belonging to his client after demand for payment thereof, and it was the court's duty to enter it."

Now, October 20, 1930, it is ordered, adjudged and decreed that the name of Irvin P. Bowman be and the same is hereby stricken from the roll of attorneys admitted to practice law in the several courts of Dauphin County, Pennsylvania, and he is, therefore, now disbarred from practice as an attorney therein.

The prothonotary is directed to certify a copy of this order to the prothonotary of the Supreme Court.　　　From Homer L. Kreider, Harrisburg, Pa.