## In Re Disbarment Proceedings.

82

Argued January 15, 1936, and January 16, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN and BARNES, JJ.

84

86

88

90

*B. D. Oliensis,* with him *Nathan Lavine* and *John P. Connelly,* for appellant (Appeal, No. 316).

*John P. Connelly,* with him *Nathan Lavine* and *B. D. Oliensis,* for appellant (Appeal, No. 317).

*Nathan Lavine,* with him *B. D. Oliensis* and *John P. Connelly,* for appellant (Appeal, No. 318).

*Wm. A. Gray,* with him *Edward A. Kelly,* for appellant (Appeal, No. 321).

*C. Brewster Rhoads,* with him *John F. Headly* and *James W. Tracey, Jr.,* for Committee of Censors of Philadelphia Bar Association.

OPINION BY MR. CHIEF JUSTICE KEPHART, March 23, 1936:

These proceedings originated in a letter from the President Judge of Common Pleas No. 2, Philadelphia County, addressed to the Chancellor of the Bar Association. That letter stated that there was a firm and widespread belief that criminal gangs and racketeers regularly employed members of the bar; that they obtained professional advice and guidance from these attorneys in their systematic lawbreaking; and that the actual defendants, gangsters' agents, are represented by counsel whom they have never seen or heard of until the attorneys appear beside them at the bar of the criminal court, and that the fees of these attorneys are paid by the heads of the organizations.

The letter asked for the appointment of a committee to conduct an investigation for the purpose of ascertaining the nature, terms and conditions of the employment of lawyers who practice largely in the criminal courts or who might have improper and unprofessional relations with organized crime. The Board of Governors, with the concurrence of the Chairman and the Chancellor, appointed a committee of five to conduct the investigation, and, on petition, this committee was authorized by the Court of Common Pleas to issue subpœnas and administer oaths as provided by the Act of June 12, 1931, P. L. 543. In the order approving the request for such powers the court specifically stated that the appointment was approved "for the purpose of investigating charges against the professional conduct of the members of the bar of the said court."

The Committee immediately began its investigation, concerning itself primarily with the "numbers racket." It examined police officials, magistrates, procurers of

bail, defendants awaiting trial and those whose cases had been tried in the criminal courts. The scope of the inquiry embraced the calling of 425 witnesses and taking of approximately 4,000 pages of testimony. In the course of the investigation of the numbers racket it became aware of a number of other irregular practices involving chiefly the defense of drunken drivers of motor cars. It is to be noted with some regret that the officers of the law offered but little coöperation, and the work pursued by the committee was accordingly rendered more difficult. The committee found from the testimony before it that certain attorneys were guilty of improper conduct in connection with the numbers racket, the drunken drivers racket and with another individual case. They set forth their conclusions in the form of a report which also contained a summary of the evidence. The report was made to the court, and thereupon it issued a rule against the various appellants noted in the above numbers and terms, to show cause why they should not be disciplined for professional misconduct. The action of the court in issuing the citation was based on the report of the committee, the summary of the testimony and the recommendations involved in the report. No petition, complaint or affidavit was filed against any of the parties against whom the rule issued.

The members of the bar thus cited were served with a copy of the rule, and the report and the summary prepared by the committee of the notes and testimony taken before it, as it affected them. They filed an answer and requested leave to examine the notes of the testimony taken before the committee. This request was denied, but when the case was tried each of them was accorded the right to examine any of the testimony that was taken before the committee for the purpose of enabling them to examine or cross-examine the witnesses.

The trial proceeded on the rule and answer before the five president judges of the five common pleas courts of Philadelphia County. Testimony was taken which con-

sumed considerable time and the judges, having found the several defendants amenable to discipline, disbarred them as appears in the opinions filed in each separate number and term above referred to. The specific findings of the court upon which the disbarment orders were made related to unprofessional conduct in connection with the drunken drivers racket, professional participation in the numbers racket in an improper and unethical manner not compatible with the office of a lawyer, and unethical conduct in connection with the Kroekel case.

In the memorandum filed by the reporter these three specific charges are dealt with factually at length, but as three cases involve the same specific legal questions, we consider phases applicable to all cases in this opinion.

It may be stated at the outset that if counsel were guilty of any one of the charges alleged their disbarment would follow. In The Canons of Ethics of the American Bar Association the following question was asked: "Is it professionally proper for an attorney to employ a 'runner' who, under the guise of a 'Bail Procurer,' persuades those accused of crime to employ the attorney to represent them?" It was answered as follows: "It is disreputable . . . to employ agents or runners . . . or to pay or reward, directly or indirectly, those who bring or influence the bringing of cases to an office, or to remunerate policemen, court or prison officials, physicians, hospital attaches or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the criminal, the sick and the injured, the ignorant or others to seek professional services. A duty to the public and to the profession devolves upon every member of the Bar, having knowledge of such practices upon the part of any practitioner, immediately to inform thereof to the end that the offender be disbarred. Canon 28." The employment of runners is most unethical and highly improper, and should not be tolerated by any court to whose attention the facts are shown, nor by any

association of lawyers who adopt and abide by the canons of professional ethics.[1]

In *Maire's Disbarment,* 189 Pa. 99, we disbarred an attorney for employing "runners" to secure negligence cases. The court below, affirmed in a Per Curiam opinion by this court, stated: "Lawyers who employ runners and pay them for hunting up cases . . . violate their oaths. They do not behave with all good fidelity to the court and client." See also *Klensin v. Board of Governance,* 312 Pa. 564.

Conduct similar to that here charged has been before other courts. The case of *In re H—— S——,* 69 S. W. (2d) 325 (Mo. 1934), involved charges against a lawyer for attempting to corrupt and induce a member

---

[1] In *Chreste v. Com.,* 171 Ky. 77, 186 S. W. 919, the court likewise condemned the practice of securing legal business by the use of paid solicitors. In so doing the court stated, "There is a wide difference between the unprofessional and undignified practice of personal solicitation of business and the indefensible and vicious one of employing agents and runners to go about soliciting business and stirring up strife and litigation for a stipulated consideration or a contingent fee. Such agents and runners as these are not restrained in their activities by any professional or ethical sense of propriety. Their only object is to secure clients for their employers, and they use in their efforts such arts and schemes as will get results, without giving any thought or attention to the disturbing and objectionable nature of the business in which they are engaged. The friends, acquaintances, and associates of an attorney have, of course, the unquestioned right to sound his praises and divert to him such clients as they persuade, in a legitimate way, to engage his services. But there is a manifest difference between securing business through the influence and efforts of friends, acquaintances and associates, and securing it through the methods employed by the strictly commercial enterprise of paid agents. . . . When men accept employment to render such services as these men are expected to render, and their pay depends on the volume of business they can get for their employer, everybody knows that many of them will use any means to obtain the business without any regard to the method that may be used to secure it." See also: *Re Shay,* 196 N. Y. 530; *State v. Cannon,* 199 Wis. 401; *State v. Kiefer,* 197 Wis. 524.

of the police force of the City of St. Louis to furnish information to respondent relating to arrests, accidents, and injuries to persons for the purpose of enabling the respondent to procure representation of the persons injured against those alleged to be legally liable for such accidents and injuries. For this action the lawyer was disbarred. *In Re Winthrop,* 135 Wash. 135 (1925) practices very similar to those involved in the present case likewise met with disbarment. See also *In re Sims,* 97 S. C. 37.

An attorney who agrees in advance to defend persons if and when arrested for criminal offenses whose future commission is a planned certainty, or from whose conduct such an agreement may be inferred, forfeits all right to practice law. Such conduct not only obstructs justice but prevents the due administration of law. An attorney is under no obligation to aid his client in crime. His duty is to prevent its perpetration, if possible. An attorney may defend persons accused of participating in the numbers racket as writers, pick-up men or bankers, and their clients need not be limited. It is not the number of persons defended that counts, but it is the regularity, character and purpose of employment. When the purpose is to guide and aid a combination of persons engaged in crime, an attorney becomes part of the criminal system. Where a large number of cases of the same kind of crime are regularly defended by the same lawyer, where the defendants do not know and never have seen the lawyer prior to the moment of representation, and where the attorney's fees are paid by men known to be the leaders of a criminal system, a court may not only infer knowledge on his part of the criminal combination but, from the frequency of his performance and knowledge, conclude that he becomes an actual participant therein. While ostensibly defending the writers, pick-up men and the like, the real employment is from the heads of the criminal organizations.

The misconduct in the Kroekel case is so obvious and
flagrant that it needs no discussion.

If the profession is to be kept to the standard which
it claims as part of its heritage, then punishment must
be visited on those whose professional conduct trans-
gresses these standards. If attorneys are permitted to
accept regular employment from criminal leaders to de-
fend members of the criminal band there will be an end
to law and order. Obstructing or preventing the admin-
istration of law has been held sufficient to merit disbar-
ment in many cases of conduct less reproachable than
here: 2 *R. C. L.* 1091. If the practice of the law is to
degenerate into a scramble through its commercializa-
tion by attempts to secure business through runners, bail
procurers and the like, then it is useless to set up or
claim any ethical standards as guides for the incoming
attorneys. They seek to practice in a profession that
has been known for generations to set up for its govern-
ment and control the highest ethical standards. These
standards are not to be corrupted. It is the element of
commercialism run riot with consequent lack of fidelity
to court and client that strikes at the dignity of the
courts, the practice of the law and the judicial system
as a whole. It has a tendency to wrest that system from
its high position as a part of and as a potent influence
in government and to destroy the courts as the last line
of defense in the preservation of a free people as a na-
tion. If this practice is to be continued, the legal pro-
fession forfeits its lofty position in the community and
fast loses the respect of the humblest citizen. The pub-
lic, keenly alive to professional conduct, will cease to be
influenced by such a body and will in time erect some
other system or body in which the public will have con-
fidence.

Appellants challenge the regularity of the proceed-
ings. It is conceded that nothing was irregular up to
the time the committee was appointed. But the charge
is made that first, the appellants should have been called

before the committee and given an opportunity to have cross-examined all of the witnesses appearing against them and, second, that, as no specific charge had been submitted to the committee or the court specifically naming these individuals as participants except the report of the committee with a synopsis of the testimony, the appellants were denied a constitutional right and the entire proceedings were without legal support.

If the action of the court in disbarring appellants had been based on the testimony taken before the committee without summoning or giving appellants an opportunity to know the charge, employ counsel and make defense, the proceedings would be not only prejudicial to appellants' rights but would be without legal justification. Although disbarment proceedings need not take any particular form *(In re Myrland,* 45 P. (2d) 953; *In\re Baily,* 30 Ariz. 407) the indignant feelings aroused by unethical conduct should not flame to the point where the right of the attorney to be heard in his own defense is sacrificed through disorderly procedure. The power to disbar must be exercised with caution: *In re Graffius,* 241 Pa. 222. But there is nothing in this record to show that any of appellants' interests were not safe-guarded and recognized.

The work of the committee that had been appointed by the chancellor and approved by the court was in the nature of and similar to an investigation by a grand jury. The committee was endeavoring to find out the facts in connection with a growing suspicion that members of the bar had been associated and connected with gangs that had for their object the commission of crime. The committee was given wide powers. They assembled their facts from the evidence and submitted a report; it was on that report that the court acted in issuing its citation as noted. Courts need not wait for specific complaints when through regular court proceedings or otherwise it learns of unprofessional conduct *(In re Keenan,* 192 N. E. 65, 68; *Randall v. Brigham,* 7 Wall.

523; *Matter of Wool,* 36 Mich. 299; *Fish v. State Bar of Calif.,* 4 P. (2d) 937, 941), nor can it only act on petition, complaint or affidavit. It would indeed be sad if courts could not inaugurate their own system of investigation into the unlawful practices of members of the bar. But our courts are not so helpless. The law is otherwise. In supervising the activities of the court and its members, courts have an inherent power to investigate unprofessional conduct with or without complaint. When the matter is the investigation of a vicious practice grown to a system, a system which is itself criminal or grossly unprofessional and unlawful in its purposes, and which can only be broken up by an impartial investigation into its activities to find out what members of the bar were associated or connected with such system of organized crime, it is not necessary that specific charges be leveled at some one individual; the court may take cognizance of the condition and, of its own motion, call for explanations from those of its members involved therein. The court was clearly right in appointing this committee to furnish it with the necessary information. When it received information leading to a case or cases for discipline it was well within its authority in issuing citations to the offending members. Thereafter, as to them, the procedings were and are de novo. The burden rested on the committee or those in charge to prove their case by evidence which left clear the conclusion of unprofessional conduct prejudicial to the practice of law and subversive of their oath of office.

In these cases, after the formal citation issued against them, every possible right was accorded appellants. They had due notice of the charges. They were given information as to their nature, they filed answers and filed the motion to dismiss the proceedings which is now being considered. They were given every opportunity to be heard in their own defense. They were given full latitude to examine and cross-examine every witness that appeared against them. Not a shred of defense

that they could have legally offered was denied them. The testimony was all heard de novo and from that testimony the court made its findings.

It is the right and duty of a court to discipline its members who appear before it guilty of wrongdoing: *In re Davies,* 93 Pa. 116; *Wolfe's Disbarment,* 288 Pa. 331. Courts have an inherent power to make and follow rules governing such matters or to formulate new rules as the case demands so long as no right of the member charged is invaded, But the rules thus established do not restrict the general power of the courts; the power which establishes such rules in the first instance also enables the courts to disregard such rules and adopt the methods most suitable to the occasion. A court may conduct a general investigation of unprofessional conduct in an effort to rid the practice of undesirable members: *People v. Culkin,* 248 N. Y. 465. It has always been proper for a court on its own motion to issue citations against practicing lawyers: *Ex parte Steinman,* 95 Pa. 220; *Maginnis's Case,* 269 Pa. 186; *Snyder's Case,* 301 Pa. 276.

It was not error for the court to refuse to submit the testimony taken before the committee to respondents. They were no more entitled to the testimony taken than defendants to that taken before a grand jury. When summoned by rules to answer they were made aware of the charges against them. They were not only given the names of the witnesses who would appear but a summary of their evidence and, when the case was on trial, they were furnished a transcript of the evidence taken before the committee. They were deprived of no right by such procedure.

But it is argued that the committee should have confined itself solely to the subject-matter of the inquiry. It was not only appointed to ascertain whether members of the bar had a connection with organized crime and whether they aided and directed it and thus became a part of it by standing ready to defend those engaged in

102

crime, but "for the purpose of investigating charges against the professional conduct of members of the bar." When it was ascertained from that investigation that other unprofessional matters were revealed, the committee, as an arm of the court, could not close its eyes to such matters because not specifically contained in the letter of their authority. It was directed to make a general investigation of unprofessional acts and, having done so, it submitted a report thereon with recommendations. It was for the court to consider or reject the report. When the rule was issued covering matters reported, a case against the offenders had legal life from that moment only. The charges were sufficiently specific to enable appellants to meet them and prepare their defense. See *Klensin v. Board of Governance,* 312 Pa. 564, 574; *State v. Mosher,* 128 Iowa 82.

It is argued that all the evidence relating to the Kroekel case should have been excluded because no mention was made of it in the original rule. A court may consider evidence relating to a new matter brought out during the course of a disbarment hearing: *In re Burns,* 40 P. (2d) 105, 106; *In re Winthrop,* supra. The technical character of the contention that the court could not go outside of the matter specifically designated is forcefully emphasized by the fact that after the Kroekel case had been developed and was before the court for consideration, appellants in open court disclaimed any suggestion that they did not have adequate notice of this charge preferred against them. See *Re Sanitary District Attys.,* 351 Ill. 206. It must be remembered that the citations which issued against them, and which they were required to answer, incorporated a report of the special committee and a summary of the testimony that covered the three charges which we have noted above.

Appellants argue that appellants' professional connection with the Kroekel case should have been heard by the Municipal Court of Philadelphia County where the case had originated. The issue, based on detailed

charges, was the professional conduct of appellants not the merits of the Kroekel case, and it was therefore proper that the court of common pleas hear such facts of the Kroekel case as were pertinent to the issue of professional misconduct: *Sherwood's Investigation*, 259 Pa. 254.

The orders made in the above appeals, Nos. 316, 317, 318 and 321, January Term, 1935, appear in the opinions of the court dealing exclusively with each particular appeal.