Hillsborough
No. 7231

STATE OF NEW HAMPSHIRE

v.

JOHN K. THORP

May 29, 1976

*Warren B. Rudman,* attorney general, and *Richard B. McNamara,* attorney *(Mr. McNamara* orally), for the State.

*Anthony A. McManus,* by brief and orally, for the defendant.

LAMPRON, J.   The defendant John K. Thorp was indicted for

unlawful transportation of marijuana on October 20, 1973, with intent to sell (RSA 318-B:26 I (a) (Supp. 1975)) and for unlawful possession of marijuana in excess of one pound. RSA 318-B:26 I (c) (Supp. 1975). The defendant's motions to dismiss the indictment and to suppress evidence were denied. A jury waived trial in the superior court resulted in a finding of guilty on both charges. All questions of law were reserved and transferred by *Mullavey*, J.

The evidence was that on or about October 19, 1973, Sergeant Walter A. Morse of the New Hampshire State Police had a telephone conversation with a former New Hampshire police chief concerning the alleged criminal activity of the defendant. Although Sergeant Morse testified that he has known the informer for about twenty years, the identity of this individual has never been revealed. Sergeant Morse then notified Detective Lieutenant Richard J. Campbell, Jr., of the New Hampshire State Police drug investigation unit of this conversation. Morse gave Campbell the telephone number and name of the unidentified individual. Lieutenant Campbell spoke with this individual on October 19, 1973, at approximately 11:30 a.m. Campbell testified that as a result of the conversation, he learned that on the following day defendant John Thorp would be operating a green Ford Torino with New York license plates, registration number unknown; that Thorp would pick up a quantity of controlled drugs including marijuana, hashish, and cocaine at the residence of one James Bond in Waltham, Massachusetts; and that Thorp would then be returning to New Hampshire. There was evidence that the unidentified individual had never before acted as an informant.

Approximately one-half hour after receiving this information, Lieutenant Campbell passed it on to a Captain Gross of the Massachusetts State Police. At 1:00 p.m., on October 20, 1973, officers of that department took up surveillance of the Bond residence. Corporal Michael J. Shimkus testified that he and his partner, Corporal Martin, were parked in a lot about three hundred feet away from the Bond residence with an unobstructed view of a 1972 green Ford Torino with New York license plates. Corporal Shimkus further testified that at approximately 4:15 p.m., he observed the defendant accompanied by Bond go to the rear of the Torino and place two large, dark plastic bags in the trunk. After Thorp and Bond returned to the apartment building, the Massachusetts officers made a telephone call to Lieutenant Campbell in Goffstown, New Hampshire, informing him of these events. At 5:30 p.m., the defendant drove off in the green Torino and was

followed by the Massachusetts State Police officers.

The defendant was tailed from Waltham to a home in Boxford, Massachusetts, where he stopped for about twenty minutes. Thorp left Boxford in the same green Torino, travelled onto Interstate Route 495, and finally onto Interstate Route 93 heading north, all the time under surveillance by the Massachusetts State Police. Meanwhile, Lieutenant Campbell left Goffstown, travelled to Manchester, and then south on Interstate Route 93 to Salem, New Hampshire, arriving at about 6:30 p.m. Approximately fifteen minutes later as a result of a radio bulletin, Lieutenant Campbell began travelling north on Interstate Route 93 until he observed a green Ford Torino with New York license plates travelling north just beyond the Derry exit. Trooper Jacques of the New Hampshire State Police, who was driving a marked police vehicle, stopped the Torino and at Lieutenant Campbell's direction removed the defendant from the car. Lieutenant Campbell testified that after ascertaining the defendant's identity, he informed Thorp that he had probable cause to believe his vehicle contained controlled drugs. Lieutenant Campbell then removed the keys from the defendant's vehicle and opened the trunk where he found a box containing several bags and a set of scales. After finding the items in the trunk, the lieutenant arrested the defendant. The State police laboratory determined that the bags contained marijuana.

The defendant's principal argument on appeal is that it was error for the trial court to have denied his motion to suppress the evidence in this case because the warrantless search of the defendant's vehicle on the highway was made in violation of the fourth amendment to the United States Constitution. In cases where a search is conducted without a warrant the prosecution must prove that it comes within one of the exceptions to the warrant requirement, one of which is that there was probable cause to search plus exigent circumstances. *State v. Dearborn,* 114 N.H. 457, 461, 322 A.2d 924, 926 (1974); *see Beck v. Ohio,* 379 U.S. 89, 97 (1964); *Commonwealth v. Antobenedetto,* 315 N.E.2d 530, 534-35 (Mass. 1974). Although in the context of a warrantless search or seizure the requisite probable cause will in the first instance be gauged by the police, the requirements in such cases "surely cannot be less stringent" than when a warrant is obtained. *Wong Sun v. United States,* 371 U.S. 471, 479 (1963); *see Whitely v. Warden,* 401 U.S. 560, 566 (1971). The presence or absence of probable cause is determined by reference to an objective standard de-

signed to measure the probability or likelihood of criminal activity based upon a given set of facts and circumstances. *Beck v. Ohio*, 379 U.S. 89, 96 (1964); *Brinegar v. United States*, 338 U.S. 160, 175 (1949). The test is whether a reasonable and prudent person in the position of the officer who conducts the search or makes the arrest and possessed of his knowledge would believe seizable items can be found or that an offense has been or is being committed. *Beck*, 379 U.S. at 91; *Draper v. United States*, 358 U.S. 307, 313 (1959). In order to meet this test the facts and circumstances within the officers' knowledge need not be sufficient to prove guilt beyond a reasonable doubt, to make out a prima facie case or even to establish that guilt is more probable than not. *See Spinelli v. United States*, 393 U.S. 410, 419 (1969).

When the information possessed by the officer consists solely of the hearsay statements provided by an informer probable cause is lacking "absent good cause for crediting that hearsay." *Spinelli*, 393 U.S. at 424 (White, J., concurring). Generally, this rule requires a showing of "underlying circumstances" which tend to support a belief (1) in the informer's honesty and general credibility, and (2) in the reliability of his information. *Spinelli, id.* at 413; *Aguilar v. Texas*, 378 U.S. 108, 114 (1964); *State v. Moreau*, 113 N.H. 303, 307, 306 A.2d 764, 766 (1973); *see State v. Mandravelis*, 114 N.H. 634, 637, 325 A.2d 794, 796 (1974). While *Aguilar supra* and *Spinelli supra* indicate that the requirements of general credibility and reliability are "analytically severable," corroboration of the informant's reliability might also "be taken to bear upon the informer's credibility." *United States v. Harris*, 403 U.S. 573, 592, 593 (1971) (Harlan, J., dissenting). The fact that the informer gave Lieutenant Campbell a fairly detailed description of the defendant's criminal activities and that these details were subsequently corroborated by the police deserves some weight in assessing the informant's credibility. *Id.* at 593 (Harlan, J., dissenting). Moreover, although the informant in this case was not identified, there was testimony that he was a former New Hampshire police chief and that he had been known by Sergeant Morse for twenty years. We are satisfied that the informer's general credibility was sufficiently established.

As to the reliability of the information contained in the tip, there was a substantial basis for crediting the informer's report as there has been sufficient corroboration of other details provided by the informant apart from the assertion that the defendant is involved in criminal activity. *Draper v. United States*, 358 U.S. 307

(1959); *see Spinelli,* 393 U.S. at 416-17. Here, as in *Draper supra,* the police personally verified every element of the informer's tip before the search and seizure except the fact of actual possession of the drugs. Such a degree of corroboration is sufficient to support the reliability of the informer's tip and hence to establish probable cause to search defendant's automobile. *Draper,* 358 U.S. at 313; *State v. Gilson,* 116 N.H. 230, 356 A.2d 689 (1976); *State v. St. Germain,* 114 N.H. 608, 611-12, 325 A.2d 803, 805 (1974); *State v. Collins,* 112 N.H. 449, 452, 298 A.2d 742, 744 (1972).

The defendant maintains, however, that even if the police had probable cause the evidence still should have been suppressed because there was no justification for not first obtaining a warrant. The essence of the fourth amendment's guarantees lies in the requirement that probable cause be determined "by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprises of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14 (1948); *Coolidge v. New Hampshire,* 403 U.S. 443, 449-50 (1971). The basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well delineated exceptions." *Coolidge v. New Hampshire, id.* at 454-55 *quoting Katz v. United States,* 389 U.S. 347, 357 (1967). However, we agree with the State that there was ample evidence introduced to support a determination that one of the exceptions, exigent circumstances, existed. *State v. Greely,* 115 N.H. 461, 464, 344 A.2d 12, 15 (1975); *State v. Dearborn,* 114 N.H. 457, 460, 322 A.2d 924, 926 (1974). At the earliest, probable cause to search did not exist until 4:30 p.m. on October 20, 1973, when the police in Massachusetts saw the defendant place the bags in the trunk of the Ford Torino. But it could reasonably be argued that probable cause did not exist until about 5:45 p.m. when the police confirmed that Thorp was en route back to New Hampshire, thereby corroborating the final element of the informer's tip. Meanwhile Lieutenant Campbell had to travel from Goffstown to Salem to intercept the defendant. The search of the defendant's vehicle was conducted on the highway at approximately 7:15 p.m. Under these circumstances "the exigencies of the situation made that course [warrantless search] imperative." *Coolidge v. New Hampshire,* 403 U.S. 443, 455, (1971), *quoting McDonald v. United States,* 335 U.S. 451, 456 (1948); *see Texas v. White,* 423 U.S. 67 (1975) (per curiam); *Cardwell v. Lewis,* 417 U.S.

583 (1974); *Chambers v. Maroney*, 399 U.S. 42 (1970).

The defendant also excepts to the denial of his motion to dismiss the indictment based upon the so-called varied species doctrine. At the trial, the defendant put an expert witness on the stand who testified that cannabis is a polytypic plant and that there are morphological differences between three species — Cannabis Sativa L., Cannabis Indicia, and Cannabis Ruderalis. Defendant's expert testified that the three types could not be distinguished by any chemical test since all three types were chemically identical, but could be identified only by examination of physical characteristics such as leaf size. The State police laboratory had dried and shredded the cannabis taken from the defendant in order to test it, and it was impossible to definitively ascertain whether the cannabis was Cannabis Sativa L. or Cannabis Indicia or Cannabis Ruderalis.

On the date of the offense in this case, RSA 318-B:1 IV (Supp. 1969) provided in part that "'Cannabis-type drugs' means all parts of the plant Cannabis Sativa L. whether growing or not . . . ." By Laws 1975, 255:2 (effective August 5, 1975) this section was amended to read in part: "'Cannabis-type drugs' means all parts of any plant of the Cannabis genus of plants, whether growing or not . . . ." The defendant's position is that his motion to dismiss the indictment should have been granted because the State failed to prove the existence of Cannabis Sativa L. We disagree.

While a scientific basis may exist for recognizing several species of Cannabis, the distinctions now being drawn are merely based on morphological variations. On the other hand, the regulation of marijuana by the State stems from the physiological effects it produces which are solely a function of the plants' chemical composition. We take judicial notice of the fact that "[a]ll three [species] contain the psychoactive ingredient tetrahydrocannabinol." D. Berheim, Defense of Narcotic Cases § 4.04A, at 4-36 (1975). Since the chemical ingredient which prompts the State to proscribe the possession, transportation and sale of marijuana is common to each species of the genus Cannabis, it is difficult to believe that our legislature intended to regulate merely one member of the genus Cannabis. Rather, notwithstanding the 1975 amendment, we think it is evident that by the 1969 statute our legislature intended and the general public fairly understood that all species of Cannabis possessing hallucinogenic properties were included in the definition of "Cannabis-type drugs." It is significant to note that United States Courts of Appeal have reached the same result

in interpreting an identical definition of "marijuana" contained in the federal Drug Abuse-Prevention and Control Act, 21 U.S.C.A. § 802 (15). *See, e.g., United States v. Spann,* 515 F.2d 579 (10th Cir. 1975); *United States v. Walton,* 514 F.2d 201 (D.C. Cir. 1975).

The defendant's final exception concerns the State's failure to honor his request that the identity of the informer be disclosed. There may be instances where, at the risk of having the prosecution dismissed, due process compels the disclosure of the informer's identity such as where the defendant would otherwise be denied the right to confront his accusers or denied the right to a fair trial. *See Roviaro v. United States,* 353 U.S. 53, 60-62 (1957). However, "no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro, id.* at 62; *see* 8 J.H. Wigmore, Evidence § 2374 (J.T. McNaughton ed. 1961); F. Wharton, Criminal Evidence § 580 (13th ed. C. Torcia 1973); McCormick, Law of Evidence § 111 (E.W. Cleary ed. 1972). In the present case, the purpose for seeking disclosure relates solely to whether or not probable cause existed and the defendant's "guilt or innocence is not at stake." *McCray v. Illinois,* 386 U.S. 300, 311 (1967). In such cases the general rule is that the State is privileged to withhold disclosure of the informer's identity. *Id.; United States v. Mehciz,* 437 F.2d 145, 149 (9th Cir. 1971), *cert. denied,* 402 U.S. 974 (1971); *see* Fed. R. Evid. 501. *See generally* Annot., 76 A.L.R.2d 262 (1961 & Later Case Service.) Where, as in this case the trial court could properly find from evidence in open court and subject to cross-examination that the officers relied in good faith upon credible information supplied by a reliable informant nondisclosure of his identity was justified. *McCray v. Illinois supra;* B. Jones, The Law of Evidence § 21:39 (6th ed. S.A. Gard 1972).

*Exceptions overruled.*

All concurred.