Merrimack
No. 80-341

THE STATE OF NEW HAMPSHIRE

v.

LEONARD J. MERSKI

October 14, 1981

*Gregory H. Smith*, attorney general (*Andrew R. Grainger* and *Michael A. Pignatelli*, assistant attorneys general, on the brief, and *Mr. Grainger* orally), for the State.

*Sheehan, Phinney, Bass & Green P.A.*, of Manchester (*W. Michael Dunn* and *Stephen E. Weyl* on the brief, and *Mr. Weyl* orally), for the defendant.

PER CURIAM. This is an interlocutory transfer by the Superior Court (*Souter*, J.) of questions posed in several motions filed by the defendant.

The first motions seek to suppress evidence and testimony as being tainted by an alleged breach of our Rule 37(18), which requires that all records and proceedings involving allegations of misconduct by an attorney remain confidential. We hold that a breach of confidentiality, if any, by this court's Professional Conduct Committee (Committee) does not render the proposed evidence and testimony inadmissible in a subsequent prosecution of the defendant for theft under RSA ch. 637.

The other motions filed by the defendant seek to quash his indictment on the basis that it is insufficient and unconstitutionally vague. We hold the indictment to be sufficient.

The defendant Merski, an attorney whose affairs were being inquired into by the Committee, resigned with prejudice from the bar under our Rule 37(10). On August 1, 1978, by order of this court, the resignation was accepted, and the Committee was ordered to obtain the defendant's files and to supervise the winding up of his law practice. *See* Supreme Court Rule 37(14)(h), 37(15)(a).

On August 4, 1978, a hearing on a petition for an accounting of the Wells estate, which the defendant represented, was continued by the probate court because Merski had resigned from the bar and was not present in court. This action was reported to both the chairman of the Committee, Mr. Raulerson, and to its administrator, Mr. Miller. At that time, no committee member knew the specific facts regarding the Wells estate or that irregularities might have occurred in the handling of estate funds. Mr. Miller, who since the August 1 court order had attempted to contact the defendant to make arrangements to take possession of all files, was requested by Mr. Raulerson to obtain the Wells file and to deliver it to whoever would assume representation of the estate. That same day, Attorney Bruce E. Viles requested the file, and Mr. Miller told her that it would be delivered to her upon production of written authorization from the executrix of the estate.

On August 7, 1978, Mr. Merski's secretary turned over the Wells file to Mr. Miller, who requested it pursuant to this court's order. Without examining it, he placed it in the trunk of his car. On August 10, 1978, Merski wrote to Miller indicating that he had spoken to Mrs. Viles, that she would have an authorization from her client to pick up the file, and that he, Merski, had arranged to meet with her and provide her with whatever assistance she might need. On August 14, 1978, Miller delivered the file to Viles, who expressed concern about the extent of her responsibility to anyone beyond her client.

Mr. Miller, by letter to Mrs. Viles dated August 17, 1978, noted that the estate was of "continuing interest" to the Committee and that there were "concerns . . . as to funds." He instructed her to bring to the Committee's attention "any indication of defalcation" and cited DR 1-103(A) and (B) of the Code of Professional Responsibility (Disclosure of Information to Authorities).

On October 20, 1978, Mrs. Viles wrote to Mr. Miller and reported an alleged misappropriation by the defendant of nearly $6,000 of estate funds. Mr. Raulerson was notified, and he, in accordance with the policy of the Committee, "took no action in a case involving a charge of commission of a crime until after the prosecutorial authority ha[d] investigated it and, if appropriate, prosecuted." However, on October 31, 1978, he wrote the attorney general stating that it had come to the Committee's attention that Mr. Merski may have committed forgery and embezzlement in handling funds of the Wells estate. He referred the attorney general to Mrs. Viles for further information.

When an investigator for the attorney general's office sought information from the Committee, Mr. Miller refused to supply any on grounds of confidentiality under our Rule 37(18), which reads in pertinent part as follows:

"(18) *Confidentiality.*

(a) *Proceedings Alleging Misconduct.* All records and proceedings involving allegations of misconduct by an attorney shall be confidential and shall not be disclosed . . . .

. . . .

(d) *Disclosure to Authorized Agency.* The committee may disclose relevant information that is otherwise confidential to agencies authorized to investigate the qualifications of judicial candidates, to agencies investigating qualifications for admission to practice, and to law enforcement agencies investigating qualifications for

government employment. If the committee decides to answer a request for relevant information, and if the attorney/respondent who is the subject of the request has not signed a waiver permitting the requesting agency to obtain confidential information, the committee shall send to the attorney/respondent at his last known address, by certified mail, a notice that information has been requested and by whom, together with a copy of the information that the committee proposes to release to the requesting agency. The committee shall inform the subject attorney/respondent that the information shall be released at the end of ten (10) days from the date of mailing the notice unless the attorney/respondent obtains a court order restraining such disclosure.

. . . .

(f) *Duty of Participants.* All participants in the proceedings shall conduct themselves so as to maintain the confidentiality mandated by this rule. Violation of this duty shall constitute an act of contempt of the supreme court."

On January 2, 1979, a grand jury indicted the defendant for theft. RSA ch. 637. The defendant filed several motions to quash the indictment and to suppress evidence and testimony. A hearing on the motions was held on April 14 and 15, 1980, and the trial court transferred to this court the following:

"Questions raised by the Motion to Suppress.

I. Did the letter from Mr. Raulerson to the Attorney General dated October 31, 1978 contain a disclosure of information about a record or proceeding forbidden by Supreme Court Rule 37(18)?

II. If the answer to question I. is yes, is the evidence obtained by the State as a result of that disclosure subject to a motion to suppress and does the defendant have standing to make such a motion?

Questions raised by the Motion to Quash.

I. Is the indictment charging theft by obtaining unauthorized control with a purpose to deprive defective for omitting a reference to one of the alternative definitions of 'purpose to deprive' contained in RSA 637:2, III?

II. If the answer to question I. is yes, may the defect be cured by the State's electing to rely on a given defini-

tion from among the statutory alternatives, as it has done in this case?"

On November 6, 1980, the State reindicted Merski, asserting that the new indictment was identical to the original one except that it cured an alleged defect of lack of specificity. Presumably because the case was on appeal before us, the State on November 7, 1980, filed a "motion to substitute" with this court. It recited that the granting of this motion would remove the issue of specificity from our consideration. On November 10, 1980, the defendant objected to the "motion to substitute" on the ground that he might be "prejudiced by never having an opportunity to object to the second indictment in the superior court."

On December 8, 1980, we denied, without prejudice, the State's "motion to substitute." We remanded the case for the limited purpose of consideration by the superior court of any similar motion the State might elect to file. On December 11, 1980, the State filed a "motion to substitute" in the superior court. No objections having been filed, *Souter*, J., on January 12, 1981, granted the State's motion. On January 23, 1981, the defendant filed with us a motion for limited remand for the purpose of allowing him to object to the State's "motion to substitute." We granted the defendant's motion on January 30, 1981, and remanded for a prompt consideration and ruling on the merits of the motion.

On February 5, 1981, the defendant filed in the superior court a motion to quash the indictment of November 6, 1980, and in opposition to the substitution of that indictment for the indictment dated January 2, 1979. The defendant claimed that the second indictment was insufficient, vague, and violative of his rights guaranteed under the United States and New Hampshire Constitutions.

On February 25, 1981, *Souter*, J., entered an order which in pertinent part reads as follows:

"Oral motion by defendant for reconsideration of order of January 12, 1981, granting State's motion to substitute is granted. Motion to quash is denied; order of January 12, 1981 granting State's motion to substitute is affirmed, each subject to exception. I find second indictment is in effect an amendment of the first.

*THE CASE SHALL BE TRANSFERRED AGAIN TO THE SUPREME COURT.*"

We interpret this order to include resubmission to us of the questions originally posed.

■ We discuss first the defendant's claim that a breach of confidentiality by the Professional Conduct Committee renders the proposed evidence and testimony inadmissible in his prosecution. Technically, the disclosure by Mr. Raulerson may be interpreted to have been impermissible because it did not fall within the exceptions contained in Rule 37(18). We hold, however, that such a disclosure did not require the drastic remedy of suppression or exclusion.

■■ We have long held that an attorney is "an officer of the court, and subject to the control of the court, which has summary powers of investigation. . . . 'The public is entitled to ample protection against the danger of any abuse of the great powers of the office which the public . . . has conferred upon him.' " *Welanko's Case*, 99 N.H. 413, 414, 112 A.2d 50, 51 (1955) (quoting *Delano's Case*, 58 N.H. 5, 6 (1876)). "The public and the bar of this state are entitled to be assured that the practice of law is a profession which demands that its members adhere to fiduciary standards of conduct and that the failure to do so will result in expeditious disciplinary action." *Broderick's Case*, 104 N.H. 175, 179, 181 A.2d 647, 650 (1962).

■ "This court has the inherent power to take reasonable and expeditious action in the suspension or removal of members of the bar for the protection of the community. . . . In the exercise of this power this court has the obligation to make appropriate disciplinary orders 'for the protection of the public, as well as for the maintenance of public confidence in the bar as a whole.' " *Barnard's Case*, 101 N.H. 33, 34, 131 A.2d 630, 630–31 (1957) (quoting *Welanko's Case*, 99 N.H. 413, 414, 112 A.2d 50, 51 (1955)); *see* *Ford's Case*, 102 N.H. 24, 25, 149 A.2d 863, 864 (1959); *Harrington's Case*, 100 N.H. 243, 244, 123 A.2d 396, 396 (1956).

The Pennsylvania Supreme Court has held that: "It is the right and duty of a court to discipline its members who appear before it guilty of wrongdoing. Courts have an inherent power to make and follow rules governing such matters or to formulate new rules as the case demands so long as no right of the member charged is invaded. But the rules thus established do not restrict the general power of the courts; *the power which establishes such rules in the first instance also enables the courts to disregard such rules and adopt the methods most suitable to the occasion.*" (Emphasis added.) *In re Disbarment Proceedings*, 321 Pa. 81, 101, 184 A. 59, 68 (1936) (citations omitted); *see* *McLaughlin v. Philadelphia Newspapers, Inc.*, 348 A.2d 376, 380–81 (Pa. 1975).

■■ The purpose of lawyer discipline is not to punish the attorney, but to maintain appropriate standards of professional conduct for the protection of the public and the maintenance of public confidence in the bar. By removing from the profession a person whose misconduct has proved him unfit to be entrusted with the duties and responsibilities belonging to the office of an attorney, the public and those charged with the administration of justice are protected. *Silverstein's Case*, 108 N.H. 400, 401–02, 236 A.2d 488, 490 (1967); *accord, Emslie v. State Bar*, 11 Cal. 3d 210, 225, 520 P.2d 991, 999, 113 Cal. Rptr. 175, 183 (1974); *State v. Turner*, 217 Kan. 574, 581, 538 P.2d 966, 973 (1975); *Attorney Grievance Comm'n v. Kahn*, 431 A.2d 1336, 1351 (Md. 1981); *see Wholey's Case*, 110 N.H. 449, 450–51, 270 A.2d 609, 610 (1970); 7 AM. JUR. 2d *Attorneys at Law* § 26 (1980).

■■ Disciplinary proceedings "are not lawsuits between parties litigant but rather are in the nature of an inquest or inquiry as to the conduct of the respondent. They are not for the purpose of punishment, but rather seek to determine the fitness of an officer of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice. . . . Thus the real question at issue in a disbarment proceeding is the public interest and an attorney's right to continue to practice a profession imbued with public trust." *In re Echeles*, 430 F.2d 347, 349–50 (7th Cir. 1970) (citations omitted); *see In re Daley*, 549 F.2d 469, 474–75 (7th Cir.), *cert. denied sub nom. Daley v. Attorney and Disciplinary Comm'n*, 434 U.S. 829 (1977); *State v. Turner*, 217 Kan. 574, 581, 538 P.2d 966, 973 (1975).

■ Disbarment and suspension proceedings are *sui generis*, not civil, or criminal or administrative in nature, but special in character, *resulting from the inherent power of courts and to which not all of the ordinary procedural safeguards apply. Yokozeki v. State Bar*, 11 Cal. 3d 436, 447, 521 P.2d 858, 865, 113 Cal. Rptr. 602, 609, *cert. denied*, 419 U.S. 900 (1974); *see Erdmann v. Stevens*, 458 F.2d 1205, 1208–09 (2d Cir.), *cert. denied*, 409 U.S. 889 (1972); *In re March*, 71 Ill. 2d 382, 395–96, 376 N.E. 2d 213, 218–19 (1978); *In re Grievance Procedures*, 115 N.H. 310, 312, 341 A.2d 272, 273 (1975); *cf. In re Ruffalo*, 390 U.S. 544, 550 (1968); *Polk v. State Bar*, 480 F.2d 998, 1001 (5th Cir. 1973); *Office of Disciplinary Counsel v. Campbell*, 345 A.2d 616, 620 (Pa. 1975), *cert. denied sub nom. Campbell v. Disciplinary Bd.*, 424 U.S. 926 (1976). *See generally* ABA JOINT COMM. ON PROFESSIONAL DISCIPLINE, STANDARDS FOR LAWYER DISCIPLINE AND DISABILITY PROCEEDINGS (Approved Draft, 1979).

With these basic premises in mind, we now address the alleged breach of confidentiality. The defendant claims that the investigation and the instigation of the criminal prosecution resulted directly from activities of the Committee. He asserts that the chairman's October 31, 1978, letter to the attorney general directing attention to the "committee sponsored" Viles report was a breach of the confidentiality rule. Furthermore, based on *Spevack v. Klein*, 385 U.S. 511 (1967), he vaguely claims a violation of the Federal constitution's fifth amendment protection against self-incrimination. He finally argues that if the Committee had respected his right to confidentiality, the present case might never have developed. He reasons and concludes that "defendant's prosecution based on evidence obtained by the State as a direct result of the [confidentiality] violation makes suppression appropriate."

Defendant's principal argument seems to be grounded in the false premise that confidentiality is the "defendant's right" alone. *See In re Grievance Procedures*, 115 N.H. at 312, 341 A.2d at 273–74. "[T]he primary purpose underlying the imposition of confidentiality . . . is to protect the reputation of an attorney. . . . A second purpose . . . is to protect the anonymity of complainants. . . . A third purpose . . . is to maintain the integrity of pending [g]rievance [c]ommittee investigations." *People v. Pacheco*, 618 P.2d 1102, 1103–04 (Colo. 1980). It has been held that "[t]he privilege is not of the attorney alone but of the State bar. [The attorney] waives it when . . . he places his reputation as an attorney in issue. But his waiver does not affect the privilege of the State Bar acting for itself and the public." *Chronicle Pub. Co. v. Superior Court*, 54 Cal. 2d 548, 570, 354 P.2d 637, 648, 7 Cal. Rptr. 109, 120 (1960). "[T]here is an equally weighty state interest, namely, that of 'preventing public disclosure that would endanger . . . the interests of those from whom [the State] has obtained information on a confidential basis.' " (Citation omitted.) *McLaughlin v. Philadelphia Newspapers, Inc.*, 348 A.2d 376, 382–83 (Pa. 1975). We note that courts applying rules of confidentiality in judicial inquiry proceedings are in accord. *Mosk v. Superior Court*, 601 P.2d 1030, 1041, 159 Cal. Rptr. 494, 505 (1979); *Illinois Judicial Inquiry Bd. v. Hartel*, 72 Ill. 2d 225, 229–38, 380 N.E.2d 801, 803–07 (1978), *cert. denied sub nom. Alfano v. Illinois Judicial Inquiry Bd.*, 440 U.S. 915 (1979).

In discussing evidentiary privileges in New Hampshire, one writer has stated:

"By creating a system of privileges, most of which may be overridden in situations when a competing public

interest demands it, or when the privilege is being used unfairly, the court has . . . achieved the desirable result of recognizing important privileges . . . while . . . ensur-[ing] that the privileges will not injure the public interest, or be used to unfair advantage.

. . . The real purpose of any privilege is not to exclude relevant evidence, but simply to facilitate activities which require confidence. The New Hampshire scheme of qualified privilege has achieved this goal while sacrificing as little as possible of the integrity of the litigation process which is, after all, a search for the truth."

McNamara, *The Hierarchy of Evidentiary Privilege in New Hampshire*, 20 N.H.B.J. 1, 27 (1978). This article contains a discussion of numerous privileges and their susceptibility to waiver, including privileges regarding: the attorney-client relationship; the marital relationship (RSA 516:27); self-incrimination (N.H. CONST. pt. I, art. 15); informers, state secrets; trade secrets; judges; pastoral counsellors (RSA 330-B:15 (Supp. 1979)); the physician-patient relationship (RSA 330-A:19); child abuse (RSA 169:43) and newsmen. *See also* Laws 1981, ch. 367 (adult abuse).

In *Marceau v. Orange Realty, Inc.*, 97 N.H. 497, 500, 92 A.2d 656, 657–58 (1952), we interpreted a confidentiality requirement under the unemployment compensation statute (current version at RSA 282:9-M(2)) and held that:

"Production of the records and testimony . . . under the circumstances of this case will not expose the witness to the penalties provided by the section. 'The evil intended to be forestalled and prevented by this clause of the statute was the voluntary imparting by State employees of information so acquired. . . . It was not intended to impede the administration of justice in the courts by the suppression of pertinent testimony.' " (Citation omitted.)

In *Opinion of the Justices*, 117 N.H. 386, 388, 373 A.2d 644, 646 (1977), we stated that "[e]ven a statutory privilege is not fixed and unbending and must yield to countervailing considerations. . . ." In the context of the disclosure of medical testimony and records in a recommittal hearing to determine dangerousness (current version at RSA 651:11-a (Supp. 1979)), we stated that "the privileges in question are not absolute and must yield when disclosure of the information concerned is considered essential." *State v. Kupchun*, 117 N.H. 412, 415, 373 A.2d 1325, 1327 (1977); *cf. State v. Thorp*,

116 N.H. 303, 310, 358 A.2d 655, 661 (1976). Therefore even assuming, arguendo, a violation of the confidentiality rule, we are not disposed to impose the exclusionary rule as a means of enforcement.

Based on the confidentiality rule, the defendant also sought, and the State refused to grant him, transactional immunity from possible prosecution that might arise out of any information and evidence obtained from testimony of members of the Committee. The defendant relies on *Spevack v. Klein*, 385 U.S. 511 (1967), for this contention, which he equates to and translates into a fifth amendment protection for himself. He cites no other authority in support of this proposition, and we can find none. His reliance on *Spevack* is misplaced because he overlooks the fact that in that case the Court held that an attorney could not be disbarred for refusing to produce documents in a judicial inquiry into *that attorney's own conduct*. 385 U.S. at 518–19. The *Spevack* holding is in accord with the principle that the privilege against self-incrimination is a personal one and must be invoked by the witness himself. *Rogers v. United States*, 340 U.S. 367, 371 (1951). Furthermore, the privilege applies not only to answers which would support a conviction, but also to those which would furnish a link in the chain of evidence needed to prosecute someone who claims the privilege. *Hoffman v. United States*, 341 U.S. 479, 486 (1951). The fact pattern in the case before us is different from that in *Spevack* and makes the holding therein inapplicable to this case. The choice of whether the defendant testifies in the pending criminal proceedings or properly invokes the fifth amendment privilege is still, of course, his to make.

The defendant also argues that, but for the alleged breach of confidentiality in the disciplinary proceedings, the criminal charge might never have been brought against him. We are not moved by this argument and find it unsound. We endorse and adopt the words used by the Supreme Court of Pennsylvania when, in a slightly different context of double jeopardy, it stated: "If either action would bar the other, the state would be compelled to have in its midst an uncensured attorney who is a convicted criminal or an unpunished criminal who is a disbarred attorney." *Office of Disciplinary Counsel v. Campbell*, 345 A.2d 616, 621 (Pa. 1975), *cert. denied sub nom. Campbell v. Disciplinary Bd.*, 424 U.S. 926 (1976); *see In re Grievance Procedures*, 115 N.H. 310, 312, 341 A.2d 272, 273 (1975). We hold, in sum, that if a breach of our confidentiality rule (Rule 37(18)) occurred, it would not call for the imposition of the drastic remedy sought by the defendant.

The court did not transfer the question, but the parties nevertheless have briefed and argued the issue of suppressing the Wells estate file, which the defendant alleges was unlawfully seized. We usually would not consider such a question at this time, but in the interest of judicial economy we will do so here. *In re Raymond S.*, 121 N.H. 411, 414, 430 A.2d 182, 183 (1981); *State v. Pugliese*, 120 N.H. 728, 731, 422 A.2d 1319, 1321 (1980).

■■■ The defendant argues that the evidence is tainted because the Committee, as an arm of this court, represented the State when it seized the materials without obtaining a search warrant and in the absence of the defendant. We reject this attempt to invoke the exclusionary rule and hold that it is not mandated by either the federal or our State constitution.

The record supports the court's findings that no evidence or information came to the attention of the attorney general's office except what was provided by Attorney Viles and her client subsequent to Viles' letter dated October 20, 1978. The file had been turned over to Mr. Miller more than two months prior to that date. The defendant had not objected to the transfer, but rather acknowledged and tacitly agreed to it in his letter of August 10, 1978. Furthermore, the file had not been examined by anyone before it was delivered to the representative of the estate.

■■■ The court further found that Attorney Viles was not an investigatory agent for the Committee but was merely following its suggestion that she discharge her duty and responsibility as an attorney in reporting anything relating to the Committee's own concern about professional conduct. In any event, we agree with the Fifth Circuit Court of Appeals which stated:

> "[W]hen a [g]rievance [c]ommittee . . . undertakes merely to upbraid a local attorney for conduct deemed to be violative of the ethical standards of the profession . . . it is not in any sense acting in aid of the enforcement of . . . criminal laws. Such administrative action is properly viewed as a simple matter of policing the legal profession to insure that the high standards of professional integrity are maintained. We see nothing in this sort of regulatory activity which might be construed as an integral part of . . . [the] enforcement of . . . criminal laws or 'as part of a comprehensive scheme for the enforcement of the . . . [p]enal [c]ode.'" (Citation omitted.) *Polk v. State Bar*, 480 F.2d 998, 1002 (5th Cir. 1973).

As in *Kozerski v. Steere*, 121 N.H. 469, 433 A.2d 1244 (1981), we fail to see how the facts in this case bring into play the exclusionary rule. Because the receipt of the information "was not the consequence of any illegal conduct on the part of the police," the rule therefore is not applicable. *Id.*, 433 A.2d 1244. *See generally Emslie v. State Bar*, 11 Cal. 3d 210, 226–30, 520 P.2d 991, 1000–02, 113 Cal. Rptr. 175, 184–86 (1974).

We now address the question of the sufficiency of the substituted indictment. The defendant argues that it fails to allege two essential elements of the crime of theft, specifically that he had a purpose to deprive and that he obtained unauthorized control over the funds. RSA 637:3 I and II. He further argues that the State failed to describe the phrase "substantial portion of its economic value or of the use and benefit thereof would be lost."

The indictment reads:

> "did purposely obtain Five Thousand Nine Hundred Eighty-nine Dollars and Fifty Cents ($5,989.50), the property of Jane W. Brabitz, Executrix of the Estate of Evelyn R. Wells, with a purpose to withhold said money for so extended a period that a substantial portion of its economic value or of the use and benefit thereof would be lost, by withdrawing Five Thousand Nine Hundred Eighty-nine Dollars and Fifty Cents ($5,989.50) from Savings Account No. 01-006408-7 at the Indian Head National Bank, without authority to do so, in violation of New Hampshire Revised Statutes Annotated 637:3 . . . ."

██ ██ We have held that the description of an offense in the words of the statute does not always meet the constitutional requirement that a fair and full description of the offense must be alleged. *State v. Bussiere*, 118 N.H. 659, 661, 392 A.2d 151, 153 (1978) (citations omitted). An indictment is sufficient if it gives enough information by setting forth all the necessary elements of the offense so that the defendant can prepare for trial and if necessary plead his conviction or acquittal as a bar to further prosecution for the same offense. *State v. Taylor*, 121 N.H. 489, 495, 431 A.2d 775, 778 (1981). "The test is not whether the information could be more comprehensive and certain. To the contrary, the information need contain only the elements of the offense and enough facts to warn the accused of the specific charges against him." *State v. Manchester News Co.*, 118 N.H. 255, 257, 387 A.2d 324, 327, *appeal dismissed*, 439 U.S. 949 (1978). A reading of the

indictment discloses that it clearly meets our standards, and we hold that it is sufficient.

*Remanded for trial.*

DOUGLAS, BROCK and BATCHELDER, JJ., did not sit; the others concurred; GRIMES, Ret. C.J., sat by special designation pursuant to RSA 490:3.