Hillsborough
No. 83-334

THE STATE OF NEW HAMPSHIRE

v.

RICHARD J. COTE

May 24, 1985

516

*Peter W. Mosseau*, acting attorney general (*Robert B. Muh*, attorney, on the brief and orally), for the State.

*Holland & Aivalikles*, of Nashua (*Francis G. Holland* on the brief and orally), for the defendant.

SOUTER, J. The defendant was convicted of receipt of stolen property (RSA 637:7), possession of more than a pound of marijuana (RSA 318-B:26, I(c)), possession of marijuana with intent to sell the same (RSA 318-B:26, I(a)(2)), and possession of cocaine (RSA 318-B:26, I(b)(1)). In this appeal the defendant presses multifarious claims that the Superior Court (*Flynn*, J.) committed error in rulings relating to the sufficiency of pleadings, the admissibility of evidence and the conduct of the trial. We affirm.

On December 16, 1981, Nashua police arrested Edward Brinkman for burglaries of several apartments, from which five guns, a wrist watch, and a radio had been taken. After admitting the burglaries, Brinkman told the police that in an earlier conversation the defendant had suggested that if Brinkman could obtain some guns he might be able to sell them for as much as $50 apiece. Brinkman said that he had left the stolen property at Rosie's Rusty Nail Restaurant, run by the defendant. Based on this information the police obtained a warrant to search for the stolen property. The warrant described the place to be searched as "72 1/2 West Hollis Street, Nashua, New Hampshire doing business as Rosie's Rusty Nail, situated on the first floor of a three story building . . . ."

Early the same evening, the police served a copy of the warrant on the defendant at the restaurant. When he learned that the police were searching for stolen guns, the defendant agreed to produce them. He opened a padlocked door to the cellar and led the police downstairs, where he retrieved the stolen guns from a crawl space. The police then noticed and seized a suitcase matching the description of one that Brinkman said he had used to carry the weapons. Before returning upstairs one officer noticed a pair of open boxes. They contained clear plastic bags filled with what appeared to the officer, and later proved, to be marijuana, weighing eight pounds. The police seized the bags, arrested the defendant and gave him *Miranda* warnings. They then took the defendant upstairs, where he dropped a plastic bag containing packets of white powder, which was found to be cocaine.

In the meantime, police upstairs found a briefcase containing the stolen watch. They never found the radio, however. By the end of the search, the police had found and seized another twelve pounds of marijuana and a triple beam scale, which one officer recognized as a device commonly used to measure quantities of marijuana for sale.

In the aftermath of the search, the police charged the defendant with receipt of stolen property, possession of more than a pound of marijuana, possession of marijuana with intent to sell it and possession of cocaine with like intent. After trial, a jury convicted the defendant of all charges except the last, finding the defendant guilty of simple possession of cocaine. The defendant appealed.

We first consider the defendant's challenge to the sufficiency of the indictment charging him with theft by receipt of stolen property. The body of that indictment charged that on December 16, 1981, in Nashua, the defendant

> "[d]id, with a purpose to deprive Kurt Peterson thereof, retain property belonging to Kurt Peterson, believing the

said property probably had been stolen, the said property being five (5) firearms in violation of RSA 637:7."

Before trial the defendant moved to dismiss the indictment on the ground that its allegation of intent to deprive was insufficiently detailed.

To understand his position it is necessary to consider two related statutory provisions. The first is RSA 637:7, I, which creates the offense of receipt of stolen property by providing that

"[a] person commits theft if he . . . retains . . . the property of another . . . believing that it has probably been stolen, with a purpose to deprive the owner thereof."

The second is RSA 637:2, III, which amplifies the foregoing statute by providing that

" '[p]urpose to deprive' means to have the conscious object:

(a) To withhold property permanently or for so extended a period or to use under such circumstances that a substantial portion of its economic value, or of the use and benefit thereof, would be lost; or

(b) To restore the property only upon payment of a reward or other compensation; or

(c) To dispose of the property under circumstances that make it unlikely that the owner will recover it."

*Cf.* R. PERKINS, CRIMINAL LAW 266 (2d ed. 1969) (at common law, intent to steal required intent to deprive permanently); *State v. O'Brien*, 114 N.H. 233, 235, 317 A.2d 783, 784 (1974) (grand larceny but not "joy riding" requires intent to deprive permanently).

■■ The defendant moved to dismiss the indictment on the ground that it failed to charge him with one of these specific variant forms of "purpose to deprive." This challenge to the indictment implicitly rests on the requirement of part I, article 15, of the State Constitution, which we have interpreted as requiring that a complaint or indictment "inform the defendant of the offense for which he is charged with sufficient specificity so that he knows what he must be prepared to meet and so that he is protected from being put in jeopardy once again for the same offense." *State v. Inselburg*, 114 N.H. 824, 827, 330 A.2d 457, 459 (1974) (citations omitted). We have established a threshold for meeting that standard, by requiring an indictment to set forth "all of the necessary elements constituting the offense." *State v. Taylor*, 121 N.H. 489, 495, 431 A.2d 775, 778 (1981). *See* RSA 625:11, III.

We find no indication in the record that the defendant's prepara-

tion for trial was actually prejudiced in any way by the failure of the indictment to allege one of the RSA 627:2, III variants specifically. In the present posture of the case, therefore, the appeal from the denial of the motion to dismiss raises only the question whether as a general rule of pleading we should classify the RSA 627:2, III variants as elements, one of which must always be alleged. For the following reasons we hold that alleging one of the variants is not necessary.

Starting at the most obvious point, it is not necessary to allege one of the variants in order to allege the mental element that is necessary for the commission of a crime, *see* RSA 626:2, since an allegation of intent to deprive states a mental element. Nor would the allegation of one or another of the variants affect the degree of culpability or the severity of the offense charged. *Compare, e.g.,* RSA 630:1-b, I(a) *and* RSA 630:2, I(b) (certain forms of second degree murder and manslaughter distinguished by difference between knowing and reckless state of mind). *See generally State v. Bussiere,* 118 N.H. 659, 664, 392 A.2d 151, 155 (1978). This is consistent with the fact that all of the variants have a common characteristic: they are states of mind that create, at the least, a "substantial risk of loss to the owner" of the stolen property. *See* REPORT OF COMMISSION TO RECOMMEND CODIFICATION OF THE CRIMINAL LAWS § 582:2 comment, at 62 (1969). Therefore, a defendant charged with intent to deprive knows that he is charged with having had a conscious mental state that created such a risk of loss, and he knows this without any further specification of one of the RSA 637:2, III variants.

It is fair to say, then, that the specific allegation of one of the statutory variants has no bearing on culpability, and the allegation of intent to deprive, without more, indicates the basic harm that is threatened by any one of the variant forms of deprivation. The utility to the defendant of classifying the variants as elements so that one of them must be particularly alleged would therefore be limited at the very least.

In fact there probably would be no utility at all in such a requirement. This becomes apparent as soon as one identifies the cases in which specification of one of the variants would appear to be most helpful to a defendant. These would be cases in which the facts pleaded in the indictment and the circumstantial evidence bearing on intent are consistent with more than one of the RSA 637:2, III variants. At first glance, it would seem that in these cases the specific allegation of one variant would narrow the potential scope of the charge, making it easier for the defendant to prepare for trial.

In practice, however, the result would be otherwise. Any such

advantage to the defendant would, of course, create a corresponding risk to the prosecution, a risk of making a wrong prediction about which variant the jury would ultimately find consistent with the circumstantial evidence of intent. To guard against that risk, prosecutors would inevitably seek multiple indictments, or indictments with multiple counts, each alleging a different variant. *See State v. Allison*, 126 N.H. 111, 489 A.2d 620 (1985).

Once the prosecution had resorted to multiple charges, however, the apparent utility to the defendant of specific pleading would simply disappear. A defendant faced with several counts, each specifically charging one of the statutory variants, would know nothing more than RSA 637:2, III would otherwise inform him about the possible arguments that a prosecutor could make to the jury. The result, in short, would be a useless proliferation of pleadings. We therefore conclude that there is no substantial, practical consideration that would support a requirement to allege one of the statutory variants.

Nor does protection against double jeopardy require any different result. Part I, article 16 of the Constitution of New Hampshire forbids double jeopardy for the "same crime or offense," and the fifth and fourteenth amendments of the Constitution of the United States forbid double jeopardy for the "same offense." *See Benton v. Maryland*, 395 U.S. 784, 795 (1969); *see generally Heald v. Perrin*, 123 N.H. 468, 464 A.2d 275 (1983); *Missouri v. Hunter*, 459 U.S. 359 (1983); *Blockburger v. United States*, 284 U.S. 299 (1932). Unless a simple allegation of intent to deprive would allow the State to mask the identity of two offenses as charged, there could be no double jeopardy problem. We see no such possibility. Indeed, the risk of a double jeopardy issue would arise only if we were to hold that the statutory variants were elements that must be specifically pleaded; such a holding would invite the argument that indictments alleging different variants alleged different offenses, so that acquittal of one would not bar indictment for another.

■ Consequently, we hold that the RSA 637:2, III variants are not elements that must necessarily be alleged in theft indictments requiring proof of intent to deprive. *See State v. Fennelly*, 123 N.H. 378, 385–86, 461 A.2d 1090, 1094 (1983). The motion to dismiss was properly denied.

We next consider the defendant's several arguments that the trial court should have suppressed evidence seized at the Rusty Nail. He rests these arguments both on the requirements of part I, article 19 of the Constitution of New Hampshire and on the fourth and fourteenth amendments of the Constitution of the United States. We will

consider the defendant's contentions first under the Constitution of New Hampshire, *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), citing decisions of the Supreme Court of the United States and of courts of other jurisdictions for their helpfulness in analyzing and deciding the State issues. *See Michigan v. Long*, 103 S. Ct. 3469, 3475–76 (1983). Since on the issues before us we conclude that the federal law is not more favorable to the defendant, we make no separate federal analysis.

The defendant's first argument for suppression of evidence seized at the Rusty Nail is that the warrant was not supported by a demonstration of probable cause to believe that there was a substantial likelihood of finding incriminating evidence at the restaurant. While he does not contest the facial sufficiency of the affidavit presented to the issuing magistrate, he claims that the affidavit was tainted by police misrepresentation. Accordingly, he relies on *State v. Spero*, 117 N.H. 199, 371 A.2d 1155 (1977) in asserting that the warrant was invalid.

■ *Spero* holds that a warrant issued on the strength of a facially sufficient demonstration of probable cause is nonetheless invalid if the evidence necessary to establish the probable cause included material misrepresentations made knowingly or recklessly. *Id.* at 204–05, 371 A.2d at 1158. In this case, the misrepresentation is said to have been one of omission, bearing on Brinkman's reliability and credibility. When the police told the magistrate about the statement that Brinkman had given them, they did not add that Brinkman was an alcoholic who was at that time suffering withdrawal. The defendant argues that this information would have weakened the foundation for the warrant and that the failure to give it to the magistrate was tantamount to misrepresentation.

■ We reject this argument. While there is disagreement about the facts of Brinkman's condition, we will assume that he was undergoing withdrawal. It is not apparent that withdrawal, however, without more, would have rendered Brinkman less credible or reliable than he would otherwise have been. There is, for example, no claim or evidence that the police withheld any palliative from Brinkman as an inducement to obtain his statement. Nor is there any indication that withdrawal was so serious as to affect the reliability of his recollection of the events in question. Hence, there is no basis to argue that failure to disclose Brinkman's illness could have risen to the level of materiality that *Spero* requires. *See State v. Chaisson*, 125 N.H. 810, 814, 486 A.2d 297, 300 (1984) (misrepresentation not material where accurate rendition of information would not have detracted from informant's credibility). There is, moreover,

no evidence that any failure to tell the magistrate about Brinkman's condition was either intentional or reckless. Hence there is no basis to impugn the sufficiency of the affidavit to support the warrant.

The defendant next contends that the trial court should have suppressed evidence taken from the basement of the Rusty Nail, arguing that the search of the basement exceeded the physical scope of the authority provided by the warrant. The defendant rests his position on the language of the warrant that authorized a search of premises located at "72 1/2 West Hollis Street, Nashua, New Hampshire doing business as Rosie's Rusty Nail, situated on the first floor of a three story building . . . ." The defendant argues that a search under that warrant could not extend beyond the first floor, without doing violence to the requirements of the National and State Constitutions, that a search warrant must "particularly" describe the place to be searched. U.S. CONST. amend. IV; N.H. CONST. pt. I, art. 19; *State v. Moreau,* 113 N.H. 303, 306 A.2d 764 (1973). Since the police found and seized the guns, marijuana and scale in the basement, the defendant submits that they were obtained illegally and should have been suppressed.

The State responds by arguing that the search did not exceed the scope of the warrant and, alternatively, that the defendant consented to the basement search. We do not deal with the issue of consent, since we hold that the warrant did authorize the basement search.

The constitutional requirement, that warrants describe with particularity the places that may be searched, was a response to the abuses authorized by the writs of assistance before the Revolution. *See Boyd v. United States,* 116 U.S. 616, 624–25 (1886). The constitutional provisions do not, however, explain the degree of precision that is necessary to satisfy the requirement of particularity. Efforts at explanation customarily begin with the statement that "'[i]t is enough if the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended.'" *State v. Moreau, supra* at 308, 306 A.2d at 767 (quoting *Steele v. United States No. 1,* 267 U.S. 498, 503 (1925)).

In practice, this general standard has begotten two lines of cases. First, there are those in which language identifying one dwelling unit has been held to limit the permissible search to that unit alone. For example, in *Keiningham v. United States,* 287 F.2d 126, 129 (D.C. Cir. 1960), the court of appeals held that a warrant to search a row house identified as 1106 18th Street was not authority to search the house at number 1108, even though the defendant had cut a door through the party wall and was occupying the latter house as well. Similarly, *Commonwealth v. Hall,* 366 Mass. 790, 799–800, 323

N.E.2d 319, 325–26 (1975), held that the scope of a warrant's author-ization to search a second floor apartment occupied by the owner of a building did not extend to a third floor apartment which the owner also used for illegal activity. Although in these cases only one person occupied two separate dwelling units, the results of the cases are best understood as resting on the fact that separate dwelling units are usually occupied by different people. The courts have therefore fashioned a general rule to limit the risk of violating one person's privacy on the authority of a warrant directed against another.

The cases in the second series hold that the description in a war-rant of a dwelling or commercial unit extends the scope of the war-rant to structures and spaces that are exclusively appurtenant to that unit, at least in the absence of any expressly limiting language. For example, a warrant to search "premises known as the . . . Fine residence and being a one story white frame dwelling" included au-thority to search the curtilage and a shed 20 feet from the house. *Fine v. United States*, 207 F.2d 324, 324–25 (6th Cir. 1953), *cert. denied*, 346 U.S. 923 (1954). Similarly, a description of "premises . . . at 20 Forest St." was held to include an unconnected garage, *State v. Brochu*, 237 A.2d 418, 420–23 (Me. 1967). Such a description would include any outbuildings in close proximity to the house indicated in the warrant. *State v. Roach*, 322 So. 2d 222, 226 (La. 1975).

Cases have fallen into this second category even when the descrip-tions have been more precise, and therefore ostensibly more limit-ing, than those quoted so far. Thus, business premises described as "the entire first floor" have been held to include a balcony room sit-uated at a level higher than the first floor. *Rainey v. State*, 74 Wis. 2d 189, 204, 246 N.W.2d 529, 535–36 (1976). A description of "the entire apartment located on the second floor" has carried with it the third floor attic, when the attic had no separate address, was used only by the occupant of the apartment and could be entered only from the apartment. *Commonwealth v. Scala*, 380 Mass. 500, 509, 404 N.E.2d 83, 89 (1980). And, bearing close analogy with the present case, *Unit-ed States v. Palmisano*, 386 F.Supp. 599, 599–600 (E.D. Wis. 1974), held that a description of "a single story brick structure, housing a front tavern area . . . and a back room" extended the right to search to the basement of the building. In the report of the case there is no indication that anyone other than the first floor occupant had access to or used the basement.

The common feature of the cases in this second group is that the areas in question were not separate dwelling or commercial units. In such instances, the same person will very probably occupy both the premises as described in the warrant and the secondary areas in

question. The privacy interests of others do not, therefore, demand a narrow construction of the warrant's terms.

On the authority of these cases it is fair to say, then, that there are two complementary general rules for interpreting a warrant's description of the place to be searched. As between different dwelling or commercial units, the description is limiting language, but as between a given unit and its own appurtenant spaces or buildings the description is merely identifying.

The facts of the present case bring it within the second line of cases exemplified by *Palmisano*. The record indicates that the defendant had control of a padlocked door opening on the basement stairs, and there is no indication that anyone else used the basement area. Therefore, the warrant's description of the first floor premises of the Rusty Nail identified the core premises and authorized the search of the basement that was appurtenant to those premises. Since no consent was necessary to search the basement, and since the terms of the warrant authorized the search for and seizure of the guns, they were properly taken.

The terms of the warrant did not, however, authorize the police to search for or to seize marijuana and a scale. Therefore as to these items, the defendant raises a third suppression issue, in arguing that their seizure cannot be justified under any of the recognized exceptions to the warrant requirement. The State has the burden to demonstrate the legality of a seizure that is not authorized by warrant, *State v. Theodosopoulos*, 119 N.H. 573, 578, 409 A.2d 1134, 1137 (1979), and the State and the defendant join issue on the applicability of the plain view doctrine to carry that burden.

A so-called plain view exception to the warrant requirement is recognized under both the State and National Constitutions. *See State v. Ball*, 124 N.H. 226, 471 A.2d 347 (1983); *Coolidge v. New Hampshire*, 403 U.S. 443 (1971) (plurality opinion); *Texas v. Brown*, 460 U.S. 730 (1983) (plurality opinion). Under the plain view doctrine, a law enforcement officer's warrantless seizure of objects with immediately apparent evidentiary significance is constitutional if the officer is lawfully at a place where he inadvertently perceives the object. *State v. Ball, supra* at 234, 471 A.2d at 352; *Coolidge v. New Hampshire, supra* at 466.

The record before us indicates that the three plain view conditions were met in this case. The conditions of lawful presence and immediately apparent evidentiary character do not require extended discussion. We have already indicated that the police were entitled to be in the basement when they observed the marijuana and scale.

They saw and recognized the first portion of the marijuana immediately after retrieving the guns. After finding the guns, they were authorized under the warrant to continue to search the premises until they found all of the objects listed on the warrant. It was during this period of authorized searching that they found the additional marijuana and the scale.

 It is also clear that the items taken had immediately apparent evidentiary significance. This requirement is satisfied if, at the time of the seizure, the officer has probable cause to believe that the object seized is incriminating evidence. *State v. Ball, supra* at 235, 471 A.2d at 352–53. In this case, the officers recognized the material in the plastic bags as marijuana based on their prior experience in drug cases, and likewise knew from past experience that the scale was of a sort customarily used to measure quantities of marijuana for sale. Thus, the officers clearly had probable cause to believe the drugs and scale were of evidentiary significance.

 The remaining question is whether the police discovered the drug evidence inadvertently. Neither State nor federal case law has settled the limits of inadvertence. *See* 2 W. LaFave, Law of Search and Seizure § 6.7(c), at 488–91 (1978). It is reasonably clear, however, that discovery is inadvertent if, immediately prior to the discovery, the police lacked sufficient information to establish probable cause to obtain a warrant to search for the object. *Coolidge v. New Hampshire*, 403 U.S. at 470–71; *United States v. Winston*, 373 F. Supp. 1005 (E.D. Mich., S.D., 1974), *aff'd*, 516 F.2d 902 (6th Cir. 1975); *see also United States v. Cushnie*, 488 F.2d 81, 82 (5th Cir. 1973), *cert. denied*, 419 U.S. 968 (1974) (because police did not have a reasonable opportunity to obtain a warrant, seizure held inadvertent despite prior existence of probable cause to search).

Therefore we may focus the dispute over the applicability of the plain view doctrine by asking whether before the search the police had information amounting to probable cause to obtain a warrant to search for drugs and the scale. We conclude that the answer is no, and that the discovery of these items was inadvertent, for the reasons that follow.

 There were two sources of evidence about what the police knew before the search: testimony from police officers and the contents of the police department's confidential investigatory file. The police officers who took the stand at the suppression hearing readily admitted that they were aware that drug sales were probably taking place at least among patrons at the Rusty Nail, and they admitted that they had been told that at some unspecified time someone

had seen a large quantity of marijuana there. While this evidence indicates that the police had justification for their suspicion that drugs could be found at the Rusty Nail, it does not indicate that they had probable cause to obtain a warrant to search the defendant's premises at the time in question.

Nor did the contents of the police file raise the information to the probable cause level. The file included several reports, compiled over a six-week period prior to the search, indicating that patrons of the Rusty Nail were using and dealing in drugs and that the defendant had possessed significant quantities of marijuana at the pub at unspecified times in the past. There were also conclusory reports that the defendant was a dealer in drugs. This information clearly justified further investigation, but it was either too conclusory or too vague about time of possession to amount to probable cause to believe that the defendant would have drugs in his possession at the pub when the police made the search. Since we find there was no probable cause to search for drugs, their discovery was inadvertent under the plain view rule. Because of this conclusion, we do not reach the further question of whether the police could lawfully have seized the marijuana as contraband, even if the discovery had not been inadvertent. *See Coolidge v. New Hampshire*, 403 U.S. 443, 471 (1971); *State v. Slade*, 116 N.H. 436, 439, 362 A.2d 194, 196 (1976).

Before concluding the discussion of the plain view issue, however, we must deal with a subsidiary matter that arose while litigating the motion to suppress. The defendant sought to examine the police file. The State refused defense counsel's request to produce it for personal inspection, claiming that the identity of a confidential informant would be revealed if the file were given to the defense. The State therefore invoked its qualified privilege to protect the anonymity of such an informant. *See State v. Thorp*, 116 N.H. 303, 310, 358 A.2d 655, 661 (1976); *Roviaro v. United States*, 353 U.S. 53 (1957); N.H. R. Ev. 509.

Confronted with this impasse, the trial judge followed the procedure that is familiar when a court must rule on a contested request for an informer's identity. The court inspected the police file *in camera* to determine whether its contents would be so helpful to the defendant as to justify forcing the State either to disclose the file for its bearing on the plain view issue, or to concede that issue and lose the drugs as evidence. *See, e.g., United States v. Freund*, 525 F.2d 873, 877 (5th Cir.), *cert. denied*, 426 U.S. 923 (1976); N.H. R. Ev. 509(c)(2); *compare Alderman v. United States*, 394 U.S. 165, 182 (1969) (*in camera* review of surveillance tapes inadequate to protect defendants' interests).

We should note here that after considering the defendant's brief and argument, we are not certain whether he contends that the trial court's *in camera* inspection was itself constitutionally tainted. It is clear, however, that he voiced no such claim in the superior court. No such issue is therefore before us. *State v. Laliberte*, 124 N.H. 621, 621, 474 A.2d 1025, 1025 (1984).

The trial judge concluded that the information in the file would not have furnished probable cause to search the Rusty Nail for drugs at the time in question, and accordingly denied the request to produce the file subject to exception. The court then sealed the file, which we have reviewed.

The defendant contends that the trial judge committed error in refusing to give him access to the file so that he could assess the significance of its contents for himself. He therefore argues that this error taints the denial of the motion to suppress to the extent that the ruling is held to rest on the plain view doctrine. We must decide, then, whether the trial court was correct in denying the defendant's request to inspect the file, and to make this decision we must first develop a test for passing on such a disclosure request. Counsel have cited no cases directly on point, and we are aware of none.

At the outset we recognize that the present issue is different from the issue normally raised by a request to disclose the identity of a confidential informant. In the usual case the defendant not only wishes to know what the informant may have told the police in the past, but also wishes to know what the informant will say when questioned, either as a potential witness or as a lead to other potential witnesses. The justification for defeating the so-called informant's privilege, therefore, is said to rest on a judgment about the value of knowing what the informant has said or may be able to say. Thus, the trial judge must order the State to reveal the informant's identity "[w]here the disclosure of [his] identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Roviaro v. United States*, 353 U.S. 53, 60–61 (1957).

The issue in this case is narrower. On this plain view issue we are not concerned with the identity of the informant, as such, or with what he may be able to say if he is identified by disclosure of the file. Rather, we are concerned only with what the informant had already told the police before the time of the search. This is the only information that bears on the ultimate issue, whether all of the information known to the police would have established probable cause for the issuance of a warrant to search for drugs at the time of the actual search.

 Since this issue is narrower than the issue in the usual confidential informant case, the test for ordering disclosure should be limited accordingly. Thus, there is no justification for opening the file and revealing the informant's identity except on two conditions: (a) evidence exclusive of the file indicates that the police could not have shown probable cause to obtain a warrant to search for drugs; and (b) evidence in the file, when added to evidence from all other sources, could be interpreted to demonstrate that the police did have probable cause to search for drugs, and therefore could have obtained a warrant to do so at the time they actually found the drugs in question.

 To strike a fair balance between defense and prosecution when applying these conditions, we must make two assumptions. First, in the absence of evidence to the contrary, we must assume that the police could establish their informant's credibility. If we did not make this initial assumption, case files, as distinguished from comprehensive files maintained on particular informants, might seldom establish the informant's trustworthiness by reference to his past performance or other collateral information about him. Second, again in the absence of evidence to the contrary, we must assume that the file, together with any unprivileged evidence, discloses a complete record of what the police knew.

 Making each of the foregoing assumptions, we conclude that the trial court was correct in honoring the State's claim of privilege by refusing to open the file to the defendant. It is true that the first condition for obtaining the file was satisfied, since the evidence in the record, exclusive of the file, indicates that the police could not have established probable cause to search for drugs at the time in question. The second condition, however, was not satisfied, for our own examination of the file convinces us that its contents could not reasonably be interpreted to demonstrate probable cause, when added to the other information that the police had. Since there was no error in maintaining the confidentiality of the file, nothing stands in the way of applying the plain view doctrine to justify the seizure of the marijuana and scale.

The defendant raises one last argument, however, which must be considered before finally determining whether the superior court properly admitted the drugs and the scale as evidence. The defendant argues that the trial judge should have suppressed these items on the ground that the police obtained the warrant merely as a subterfuge, in the sense that the dominant motive was to search for drugs, rather than for the stolen goods listed in the warrant. *See* 2 W. LaFave, Search and Seizure § 6.7(d), at 491–94 (1978).

The trial judge expressly found that there had been no subterfuge, however, and his finding must stand unless we conclude that no reasonable fact-finder could have concluded as he did on the evidence before him. *U.S. Fidelity & Guaranty Co., Inc. v. Johnson Shoes, Inc.*, 123 N.H. 148, 153, 461 A.2d 85, 88 (1983). We find no grounds to disturb the finding. The defendant stresses the evidence that the police had been concerned with drug activity at the Rusty Nail and that a detective regularly engaged in drug investigation participated in the application for the warrant and the later search. As against this, however, there was evidence that the detective participated because of his experience in obtaining and executing warrants. Moreover, there was abundant evidence that the police were intent on finishing their work on the burglary cases and recovering the stolen property. The police had, after all, solved the burglaries before learning that Brinkman was associated with the defendant. There is no plausibility in suggesting that the police would normally have ignored the opportunity to recover a group of stolen guns. Thus, the evidence supports the conclusion that a hope to find drugs did not outweigh the ostensible interest in recovering stolen goods, and there was no error in concluding that the search was untainted by subterfuge.

Before concluding our discussion of suppression issues, we note that the defendant has argued that the issuing magistrate's failure to make notes during the suppression hearing somehow violated the law, and that the warrant did not authorize an evening search. These arguments are entirely insubstantial and merit no discussion. Since we find that none of the defendant's arguments for suppression has merit, we hold that the trial court properly denied the motion to suppress the marijuana and scale as evidence.

It remains for us to consider a number of issues that do not call for extended discussion. The first of these arises from the defendant's claim that it was error to deny his motion for mistrial when a police witness testified that after receiving the *Miranda* warnings the defendant had refused to say anything "with respect to the contraband."

The defendant has raised both State claims, under part I, article 15 of Constitution of New Hampshire, and the fifth, sixth and fourteenth amendments of the Constitution of the United States. Again, we consider the State issues first, *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), citing authority from other jurisdictions solely for their helpfulness. *See Michigan v. Long*, 103 S. Ct. 3469, 3475–76 (1983). Since federal law is no more favorable to the defendant than State law, we do not make a separate federal analysis.

The defendant rests his position on the rule that a pros-

ecutor may not utilize a defendant's constitutionally protected silence as evidence. *Miranda v. Arizona,* 384 U.S. 436, 468 n.37 (1966); *State v. Booton,* 114 N.H. 750, 760, 329 A.2d 376, 384 (1974), *cert. denied,* 421 U.S. 919 (1975). However, a mere reference by a witness to a defendant's silence, without more, does not necessarily require a mistrial. *Id.* In the absence of prosecutorial misconduct or comment that cannot be cured by a cautionary instruction to the jury, *see State v. Merrill,* 125 N.H. 479, 484 A.2d 1065 (1984), an instruction to disregard the reference to silence is generally sufficient. *State v. Seeley,* 116 N.H. 831, 834, 368 A.2d 1171, 1174 (1976). *See also State v. Munson,* 126 N.H. 191, 489 A.2d 646 (1985) (further testimony may counteract any arguable prejudice). In this case the court offered to give such an instruction, but defense counsel rejected the offer. This may well have been a sensible decision, but it was a decision that does not now entitle the defendant to the drastic and wholly unnecessary alternative of declaring a mistrial.

 The defendant's further claims may be treated even more briefly. He argues that evidence of intent to sell the marijuana was wanting. It is sufficient to note that twenty pounds of marijuana and a scale are enough for this purpose. *See State v. Greely,* 115 N.H. 461, 468, 344 A.2d 12, 17 (1975). The defendant also argues that there was insufficient evidence that he knew that the guns were stolen. This ignores Brinkman's testimony that earlier in December 1981, the defendant had suggested that Brinkman might be able to obtain some guns to sell at $50 each as a way to raise money. There was no evidentiary insufficiency, and motions to dismiss on these grounds were properly denied.

The defendant's last contention is that prosecution both for possession of more than a pound of marijuana and for possession of marijuana with intent to sell subjected him to double jeopardy. We have examined the trial record carefully and can find no indication that the defendant raised this claim before the trial court. Consequently he may not raise it for the first time here. *State v. Laliberte,* 124 N.H. 621, 621, 474 A.2d 1025, 1025 (1984). We would note only that the defendant's sentences for these two offenses run concurrently, and there is no basis to infer any actual prejudice to him.

There being no error, the judgments of conviction are affirmed.

*Affirmed.*

All concurred.